(No. 69695.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT MELOCK, Appellant.

*Opinion filed July 30, 1992.—Rehearing denied October 5, 1992.*

424

Charles M. Schiedel, Deputy Defender, and Peter L. Rotskoff and Charles Hoffman, Assistant Defenders, of the Office of the State Appellate Defender, of Springfield, and Susan Frisk, law student, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen and Richard S. London, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Lake County, defendant, Robert Melock, was convicted of four counts of first degree murder. (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3).) The jury found defendant was eligible for the death penalty on the ground that the murder was committed during a home invasion (Ill. Rev. Stat. 1987, ch. 38, par. 12—11(a)(1)) and criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(1)), statutory aggravating factors. (See Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(6).) At the second stage of the sentencing hearing, the jury found no mitigating factors sufficient to preclude imposition of the death penalty. Defendant's death sentence has been stayed (134 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603). For the reasons which follow, we reverse.

## Summary of Facts

The evidence at trial established that on January 15, 1989, the body of Augustine Melock was discovered on the floor of her Waukegan home. The side door to the victim's home had been broken into and glass in the door had been shattered. The cause of the victim's death was determined to have been the "result of multiple blunt trauma to the head, with strangulation and multiple stab wounds to the neck contributing to the death." Redness in the victim's vagina and rectum was indicative of some type of penetration or irritation.

On January 19, 1989, defendant, the victim's grandson, confessed to the murder. Defendant's "verbatim" statement was read into evidence. At trial, defendant denied having confessed to the murder.

Evidence of defendant's guilt consisted largely of his confession. In addition to the confession, Susan Holloway, a prior-convicted felon, testified that on January 20, 1989, while she and defendant were in holding cells at the Waukegan police department, defendant admitted to her that he had killed his grandmother. Defendant, in his testimony, denied that he made any admission to Holloway.

There was a wealth of physical evidence, including latent fingerprints, blood-stained articles, and hair samples, which was taken from the murder scene and produced at trial. None of this evidence connected defendant to the murder scene.

Natalie Bohrer, the State's forensic science witness, testified that she compared glass fragments from the broken storm door of the victim's home with fragments taken from defendant's shoes. Three of the samples from defendant's shoes had refractive indexes similar to glass fragments from the door.

On re-cross-examination, Bohrer testified that it was possible that the glass fragments had come from the same origin; however, there was no way, based on their refractive index, to tell that two pieces of glass came from the same place. She did not know whether the glass fragments which she compared had come from the same source.

Physical evidence was also taken from defendant's home. Included among the items was a black leather jacket, a pair of black slacks, a white shirt and a pair of Reebok tennis shoes. Maria Yantz, defendant's surviving grandmother, with whom defendant was living at the time of this offense, testified that defendant wore these items on the night of the murder. Yantz also testified that she had washed the jeans, but not the shirt.

Officer William Biang of the Waukegan police department testified that he recovered the clothing from the Yantz home. According to his testimony, the shirt was folded and appeared to have been laundered. Bohrer testified that no blood was found on any of the articles of defendant's clothing.

Bohrer also examined a rug which had been taken from the basement laundry room of the Yantz home. A fragment from the rug contained chromium and iron, a material which was consistent with materials in the blade of the knife suspected to have been used to commit the offense. Additionally, Bohrer examined the inside of the knife sheath. No blood was present.

Defendant alleges numerous errors at all stages of the proceedings. Because we reverse the conviction and remand for a new trial, we need not address all of the issues raised. In the interest of brevity, we will discuss only that additional evidence necessary for a resolution of the issues addressed by this opinion.

## I. PRETRIAL

Prior to trial, defendant filed a motion to suppress his alleged confession. The motion was denied. On appeal, defendant contends that the trial court erred in denying the motion.

In reviewing a trial court's determination on a motion to suppress, we are mindful of the limited parameters of our review. Absent a determination that the trial court's finding was manifestly erroneous, we will not disturb it. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 165.) Further, we note that it is the function of the trial court to determine the credibility of the witnesses and to resolve any conflict in their testimony. *People v. Redd* (1990), 135 Ill. 2d 252, 289.

As a preliminary matter, we note that defendant and the State have inextricably intertwined their respective arguments on the issues of arrest and custody. While the two concepts share common features, they are, nonetheless, separate and distinct, and we shall address them as such. Additionally, defendant argues, generally, that his "confession" was the result of illegal police conduct. In this case, defendant's confession was preceded by an admission. While his confession may, ultimately, have been tainted by an illegality, the primary focus of our review, necessarily, concerns the police officers' conduct prior to defendant's admission.

### A. Legality of Defendant's Detention

Defendant first argues that the confession was the product of an illegal arrest and was made without the required *Miranda* warnings. The State argues, in effect, that defendant voluntarily cooperated with the police, and at the time of his admission, defendant was not in custody. Therefore, the State maintains, neither the admission nor the subsequent confession resulted from an

illegal arrest, and *Miranda* warnings were not required. Prior to proceeding with our examination of the facts in this case, we note the propriety of our consideration of the testimony adduced at trial as well as at the suppression hearing. *People v. Caballero* (1984), 102 Ill. 2d 23, 36.

Testimony adduced at the defendant's suppression hearing established that on January 15, 1989, Detectives Lou Tessmann and Donald Meadie appeared at defendant's home and asked defendant to accompany them to the Waukegan police station. Defendant agreed. Defendant entered the back seat of the police car, without being handcuffed, and was driven to the station.

Once at the station, defendant was taken to an interview room, given *Miranda* warnings and questioned. Following the questioning, defendant was transported by the detectives to St. Therese Hospital where hair and blood samples were taken. After leaving St. Therese, the detectives stopped and permitted defendant to purchase cigarettes. Defendant was then transported back to his home. At no time was defendant told that he was free to leave.

Subsequently, on the morning of January 19, Tessmann and Meadie appeared, again, at defendant's home and requested that defendant accompany them to the police station. According to the detectives' testimony, prior to being transported to the station, defendant requested, and was allowed, to brush his teeth and comb his hair. Defendant rode, without being handcuffed, in the back seat of an unmarked police car. The back doors of the car were not locked and were equipped with handles. Defendant was not told that he did not have to accompany the detectives to the police station.

Once at the station, defendant was taken to an interview room, where, from about 9:30 a.m. until 11:30 a.m., he was questioned. *Miranda* warnings were not given.

While at the station, defendant offered to take a polygraph examination to prove the truthfulness of responses he had made to the detectives. At about 11:30 a.m., arrangements were made for such an examination to be administered at the offices of John Reid and Associates in Chicago.

Defendant was transported from the Waukegan police department to the John Reid offices by the interrogating detectives. While en route to John Reid, the detectives purchased food and cigarettes for defendant. The food was purchased at the "drive-thru" window at a McDonald's. The record does not state from where the cigarettes were purchased. In any event, prior to arriving at John Reid, defendant did not leave the vehicle.

The drive from Waukegan to John Reid took about two hours. The detectives and defendant arrived at John Reid at about 2 p.m. Upon arriving, defendant sat in an unsecured waiting area while the detectives met with Michael Masokas and John Reid, the polygraph examiners. Defendant waited alone in the unsecured area for about 30 minutes. In their meeting with the polygraph examiners, the detectives informed Masokas and Reid that defendant was a suspect in the murder of his grandmother and that the purpose of the polygraph examination was to determine whether he had been involved.

Prior to interviewing defendant, Masokas reviewed documents which had been provided him by the detectives. He then conducted a general interview with defendant and "from that point, *** moved into an interview, at which time the questions were pertaining to [defendant's] grandmother's death." The initial interview lasted about one hour. Masokas did not give defendant *Miranda* warnings, nor did he tell defendant that he was free to leave.

Following the general interview, defendant was taken to another room, where Masokas administered the poly-

graph examination. Defendant was not given *Miranda* warnings nor was he told that he was free to leave prior to the examination. For purposes of the exam, defendant was questioned concerning the murder of his grandmother.

After the polygraph examination, defendant was taken back to the first interview room. Masokas subsequently joined defendant and conversed with him concerning the "results" of the polygraph examination. During this post-polygraph conversation, Masokas told defendant that the "door was unlocked" and that he could leave at any time. During the post-polygraph discussion, defendant admitted to Masokas that he had killed his grandmother. Masokas then summoned Detective Tessmann.

Tessmann entered the room, gave defendant *Miranda* warnings, then took defendant's "verbatim" statement. After taking the statement, Detectives Tessmann and Meadie placed defendant under arrest, handcuffed him, and transported him back to the Waukegan police station.

Maria Yantz, defendant's maternal grandmother, testified that on the morning of January 19, the detectives came to her home and asked to speak with defendant. She went to defendant's bedroom, awakened him and told him that the detectives wanted to speak with him. According to Yantz, the detectives told defendant that he had to go with them to the police station for questioning. Defendant told the detectives that he had to shower first. The detectives would not permit defendant to shower, telling him that he had to go right away. When defendant went to the basement to put on clothing, he was accompanied by one of the detectives.

On cross-examination, the State questioned Yantz concerning an earlier statement which she had given to the State's Attorney. In her earlier statement, Yantz had

stated that the police asked defendant to go to the police station and that he went voluntarily.

Defendant's testimony at trial concerning the events of January 19 essentially corroborated the testimony of Maria Yantz.

Following the close of the evidence at the suppression hearing, the trial court found that, prior to defendant's admission to Masokas, there was no probable cause to arrest him. The court also determined that at the time of defendant's admission, he had been subjected to interrogation. However, the court determined that prior to making the admission, defendant was not in custody and, therefore, his subsequent confession was not tainted by an illegal arrest.

We begin our analysis with an examination of the nature of defendant's detention. Both the United States and Illinois Constitutions protect individuals from unreasonable searches and seizures. (U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6.) A seizure, for fourth amendment purposes, is synonymous with an arrest. Absent probable cause or a warrant based thereon, an arrest is violative of the fourth amendment protections. See *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.

It is not disputed that, prior to defendant's admission, there was no probable cause for his arrest. Thus, if prior to making the admission, defendant was illegally detained, such illegality would infect the admission and possibly taint defendant's subsequent confession. See *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407; *People v. Holveck* (1990), 141 Ill. 2d 84.

A person has been arrested when his freedom of movement has been restrained by means of physical force or a show of authority. (*United States v. Mendenhall* (1979), 446 U.S. 544, 553, 64 L. Ed. 2d 497, 508,

100 S. Ct. 1870, 1877.) The relevant inquiry in determining whether a suspect has been arrested is whether, under the circumstances, a reasonable person would conclude that he was not free to leave. (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 61; *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.) Additional factors considered in a determination of whether an arrest has occurred include the intent of the officer and the understanding of the suspect (*People v. Wipfler* (1977), 68 Ill. 2d 158, 165) and whether the suspect was told that he was free to leave or that he was under arrest (*People v. Holveck* (1990), 141 Ill. 2d 84, 95, citing *People v. Townes* (1981), 94 Ill. App. 3d 850, 853).

We first address the State's argument that defendant was specifically informed by Masokas that he was free to leave.

We do not question the fact that Masokas told defendant that he was free to leave. However, given the context of the conversation in which the "advice," by itself, was given, we are not persuaded that this "advice" would have been perceived by defendant as an indication that he was actually free to leave. It is significant that defendant was not so advised until the post-polygraph interview, at a time when, as the record reveals, Masokas was accusing defendant of having committed the offense, admonishing him of the importance of being truthful, and asking defendant to explain his failure on the polygraph exam.

It seems to us that the "advice" was merely part of Masokas' interrogation technique, without any regard for the protection of defendant's fourth amendment rights. Had Masokas' advice been given during the general interview, or even prior to administering the polygraph examination, we could then value it as a factor favorable to a finding that defendant was not under arrest.

The State next argues that defendant was left unguarded in the John Reid office for a period of 30 minutes. Further, the State argues, public transportation was accessible within a two-minute walk from the Reid offices.

We are not persuaded that the accessibility of public transportation, in this case, necessarily supports a conclusion that defendant was not under arrest. However, in our assessment of the detectives' intent, we find the total lack of security or restraint of defendant while he was in the John Reid waiting area to be significant. This fact strongly supports a determination that defendant was not under arrest. Further, during defendant's pre-confession detention, none of the procedures which are normally associated with an arrest occurred. Notably, following his confession to Tessmann, defendant was, for the first time, handcuffed.

Defendant relies upon *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, to support his claim of illegal arrest. In *Dunaway*, the defendant was picked up from a neighbor's home, taken, involuntarily, to the police station, and after being given *Miranda* warnings, questioned. Although the defendant was not told that he was under arrest, had he attempted to leave, he would have been physically restrained. The court held that defendant's detention amounted to an arrest.

*Dunaway* is distinguishable from this case. The testimony adduced at defendant's suppression hearing was that defendant voluntarily accompanied the detectives to the police station. He was not given *Miranda* warnings, a circumstance which might be perceived by a suspect as an indication that he is under arrest. Additionally, unlike in *Dunaway*, there was no testimony to indicate whether, had defendant attempted to leave, he would have been restrained.

We also find *People v. Townes* (1982), 91 Ill. 2d 32, another case upon which defendant relies, distinguishable. In *Townes*, the defendant was subjected to interrogation for a period of more than 12 hours. During the interrogation, the defendant was consistently read his *Miranda* rights. The *Townes* court held that the 12 hours of interrogation to which the defendant was subjected exceeded permissible constitutional bounds.

In contrast, in this case, defendant was subjected to interrogation for a period of 2½ to 3 hours. Defendant then offered to submit to a polygraph examination, which resulted in continued interrogation. Thus, unlike in *Townes*, here defendant's offer prolonged the interrogation. Additionally, unlike in *Townes*, *Miranda* warnings were not given to defendant until after his initial admission of culpability.

After considering the facts and circumstances of this case, we find that a reasonable person in "defendant's shoes" would not have believed that he was under arrest. Thus, we conclude that defendant's statements were not taken in violation of his fourth amendment rights.

Having determined that defendant was not under arrest for fourth amendment purposes, we must yet address the question of whether he was, nonetheless, in custody for *Miranda* purposes. Incriminating statements which have been obtained in violation of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, are inadmissible at trial. A suspect's entitlement to *Miranda* warnings is triggered when he is subjected to custodial interrogation, "or otherwise deprived of his freedom of action in any significant way." (*Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612; see also *People v. Lucas* (1989), 132 Ill. 2d 399, 417.) We note that, in this case, *Miranda* warnings

were given prior to Tessmann's taking of defendant's confession.

In determining whether an interrogation is custodial, courts consider several factors, including: (1) the time and place of the confrontation; (2) the number of police officers present; (3) the presence or absence of family or friends; (4) any indicia of a formal arrest procedure, such as physical restraint, the show of weapons or force, booking or fingerprinting; and (5) the manner by which the individual arrived at the place of the interrogation. See *People v. Brown* (1990), 136 Ill. 2d 116, 124-25; *Lucas*, 132 Ill. 2d at 417.

We note that both *Brown* and *Lucas*, relying on *Wipfler*, 68 Ill. 2d 158, have grafted an objective test onto the traditional fifth amendment analysis of custody. We find it helpful to point out that *Wipfler* applied the "reasonable person" standard in the context of its fourth amendment analysis covering the issue of arrest. Both *Lucas* and *Brown*, however, involved an analysis of custody in the context of the fifth amendment. That notwithstanding, we continue to agree with the appropriateness of the "reasonable person" test as a consideration in the determination of custody for fifth amendment purposes. Thus, applying *Brown* and *Lucas*, after weighing the traditional factors, as recited above, the court must make an objective determination as to what a reasonable man, innocent of any crime, would perceive if he were in defendant's position. *Brown*, 136 Ill. 2d at 125; *Lucas*, 132 Ill. 2d at 417-18.

Initially, we note that defendant's visit to the police station was not initiated by him; two detectives arrived at defendant's home and requested that he dress and accompany them to the station. Defendant was not given the option to be questioned at his home or to report to the police station at a later time, after he had showered and dressed. Additionally, as we have stated, we find the

"advice" to defendant by Masokas, concerning defendant's freedom to leave, questionable.

However, while we do not view the foregoing facts favorably, they do not necessarily compel a finding of custody. In our assessment, we find additional factors to be of equal significance. First, although Maria Yantz testified that defendant was required to go to the police station, she nonetheless stated that defendant went voluntarily. Moreover, the trial court expressly stated that it did not place much credence in her testimony.

Further, we note that, while at the Waukegan station, defendant was questioned by the two detectives, and while at John Reid, only Masokas questioned defendant. Additionally, defendant was not handcuffed at any time during the interrogation and was otherwise unrestrained during the times that he was being transported by the detectives. Finally, as we have previously stated, none of the procedures normally associated with a formal arrest procedure occurred here. We believe that these facts support a finding that the degree of coerciveness, generally associated with interrogation, was diminished.

Defendant argues that once he was at the polygraph examiners' office (John Reid), which is about 25 miles from his home in Waukegan, defendant was dependent on the detectives for transportation home. In that regard, we consider that defendant offered to submit to the polygraph examination. There is no evidence that he was compelled to do so.

Defendant next argues that one of the most significant factors which indicates that he would have "reasonably believed that he was in custody" was his prior relationship with Tessmann. Defendant had previously been charged with, and was incarcerated for, resisting arrest by Tessmann. At the time of the questioning concerning the instant offense, defendant was on supervised release for the resisting arrest offense. Defendant asserts that,

in light of these facts, he would not have believed that he was free to refuse to accompany the detectives to the station.

We agree with defendant that his previous encounter with Detective Tessmann would tend to have an effect on his belief regarding his right to refuse to accompany the detectives to the station, as well as his belief concerning his freedom to leave. However, defendant testified that the detectives told him that they wanted to question him. They did not announce that defendant was under· arrest. Further, there is no indication that defendant was induced to accompany the detectives to the station against his will. Thus, even though defendant's prior experience with the detectives may have influenced his cooperative conduct, we believe that his decision to accompany the detectives was, nonetheless, voluntary.

Additionally, while a defendant's subjective belief, as in the context of an arrest (see *Wipfler*, 68 Ill. 2d at 166; *Redd*, 135 Ill. 2d at 284), is a legitimate consideration, the test for custody is what a reasonable person in the defendant's position would believe. Moreover, it was defendant's testimony that he was not certain whether he could leave, and not that he believed he could not leave.

Finally, since the detectives' expressed purpose for the polygraph examination was to determine whether defendant was involved in the murder, it appears that defendant was the focus of the investigation. Nevertheless, it was the detectives' testimony that other suspects were being investigated as well as defendant. Additionally, the fact that defendant may have been a suspect in the investigation does not automatically render his detention custodial.

Viewed objectively, the facts here could reasonably support the trial court's finding that defendant was not

in custody at the time of his admission. We find no *Miranda* violation.

In sum, defendant's detention did not amount to an arrest. Further, defendant was not in custody during the time of the interrogation. Since he was not in custody, *Miranda* warnings were not required. Thus, defendant's admission and subsequent confession were not tainted by any fourth or fifth amendment violations and properly gave rise to probable cause for his arrest. On this record, we cannot say that the trial court's findings were manifestly erroneous.

## B. Voluntariness of the Confession

Defendant next contends that the polygraph examiner's deception concerning the results of the polygraph exam, Tessmann's promise to "go to bat" for defendant, and the fact that his will was overborne rendered his admission and subsequent confession involuntary and, therefore, inadmissible. The State maintains that the confession was voluntary.

At trial, defendant testified that while he was at the Waukegan police station on January 19, Detectives Tessmann and Meadie began questioning him "more and more." Detective Meadie questioned in a loud voice, "like I was lying because I [had previously] lied to them about [a] knife." The questioning at the station continued from about 9:30 a.m. until about 12:30 p.m.

While at the police station, defendant "agreed," and the detectives made an appointment for defendant to accompany them to John Reid for a polygraph exam. After arriving at John Reid, defendant was left in a waiting room where he fell asleep. Defendant testified that, at that time, he was feeling nervous and "shook up" because he did not know what he "was going there for" or what was going on. Defendant waited in the waiting area for about 30 minutes.

Subsequently, a receptionist escorted him down the hallway to an interview room where he waited, alone, for about 30 to 45 minutes. Michael Masokas then came into the room and questioned defendant about where defendant lived, his age, and "stuff like that." Masokas would periodically leave and re-enter the room.

Following the initial interview, Masokas took defendant to another room. Masokas asked him questions about his grandmother; whether he had cut her throat and whether he had killed her. Defendant testified that almost all of the questions which Masokas asked during this interview related to whether defendant had killed his grandmother. Defendant responded to the questions about his involvement in the murder in the negative. Defendant stated that, while in the room with Masokas, he at no time admitted to killing his grandmother. The questioning lasted for about 1½ hours. (It appears from the record that this second interview was actually the polygraph examination.)

Following the second interview, Masokas took defendant back to the first interview room. Defendant described himself as being in a minor state of shock because Masokas had been asking him all those questions about his grandmother; "more or less telling me I did it." Masokas told defendant that he was "150% sure" that defendant had killed his grandmother. Upon being accused, defendant "went into shock"; he "blanked out"; he "was stunned." Defendant testified that he did not listen to what Masokas was saying because "it was dazing [him]." Masokas continued to talk to defendant for about one-half hour, but defendant was not responding because he "couldn't say anything." Masokas then left the room and Tessmann entered.

According to defendant, Tessmann sat close to defendant, put his hand on defendant's knee and told him that everything would be all right. Masokas re-

turned, gave Tessmann some paper, and left the room again. Defendant and Tessmann were in the room alone. Tessmann then started asking defendant questions.

Defendant further testified that he did not remember telling Tessmann "detail for detail" about the murder because he was "shocked that they said I killed my grandmother." According to defendant, he was unable to focus on what Tessmann was saying, but he recalled that Tessmann would read a sentence to him and then ask him about it. After Tessmann would read a sentence, defendant would say "uh-huh, uh-huh," but defendant did not know why he responded. Defendant testified that he did not hear Tessmann say that he had killed his grandmother. It was defendant's testimony that he signed a piece of paper, but that he never read it. Defendant stated that he did not know what he was signing when he signed the paper and that he did not have the "slightest" idea why he signed the paper.

After Tessmann completed questioning defendant at John Reid, the detectives transported him back to the Waukegan police department. Once back at the Waukegan station, the officers brought another paper for defendant to sign. They asked him to write something, but defendant told them that he could not write anything. Defendant recalled that he signed a typed piece of paper, but he did not read the paper and he did not ask the detectives what was on the paper.

Defendant also recalled the detectives pointing out places on the paper for him to initial for corrections. The detectives laid the paper in front of him, placed their fingers on the mistakes, and defendant initialled them. Defendant stated that he did not realize that he was signing a confession to the murder of his grandmother. After he signed the confession, the officers told him what he had signed.

On cross-examination, defendant stated that he never told Masokas that he killed his grandmother and that, while he was at John Reid, he never asked to speak with Tessmann. Defendant also stated that neither Masokas nor the police threatened or hit defendant during questioning. Finally, defendant testified that he did not remember telling the detectives anything.

At trial, Michael Masokas testified that, prior to and during the polygraph examination, defendant denied having killed his grandmother. In the post-polygraph interview with defendant, Masokas "basically accused [defendant] of committing the offense." It was Masokas' testimony that he told defendant that he had not passed the polygraph examination and that it would be important for defendant to tell the truth and to clarify what, in fact, did happen. Additionally, Masokas told defendant that the information they had available indicated that defendant had killed his grandmother. After about 10 minutes, defendant admitted to Masokas that he had killed his grandmother.

Detective Tessmann testified at defendant's suppression hearing. According to Tessmann, after the polygraph examination, Masokas informed Tessmann that defendant wanted to speak with him. When Tessmann entered the room, he "grabbed" a seat and sat facing defendant. He advised defendant of his rights, and asked defendant if he understood those rights and whether defendant was willing to talk with him. Defendant responded affirmatively. Defendant then gave Tessmann a statement regarding the death of the victim.

After defendant had given an oral statement, Tessmann asked defendant to write a statement in his own words. Defendant indicated to Tessmann that he was too upset about what had happened and that he could not write. At that time, Tessmann was provided with some paper and defendant related to him, "per sentence, go-

ing down in chronological order," what defendant recalled concerning the murder.

After completing the written statement, Tessmann gave the statement to defendant to read and sign. Defendant appeared to read the statement and then he signed it. After defendant confessed to the murder, he appeared to be upset. Tessmann then placed his hand on defendant's shoulder and told him that he would "go to bat" for him.

Detective Meadie also testified. He stated that, after arriving at John Reid with Tessmann and defendant, he did not see defendant again, until about 7:15 p.m., after defendant had confessed to Tessmann. At that time, it appeared to Meadie as though defendant had been crying.

It is a fundamental principle of criminal procedure that a confession must be voluntary; otherwise, it is inadmissible. (*Townsend v. Sain* (1963), 372 U.S. 293, 307, 9 L. Ed. 2d 770, 782, 83 S. Ct. 745, 754; *People v. Kincaid* (1981), 87 Ill. 2d 107, 117.) "The test of voluntariness is whether the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed." (*People v. Clark* (1986), 114 Ill. 2d 450, 457; *People v. House* (1990), 141 Ill. 2d 323, 376.) A determination of voluntariness requires consideration of the totality of the circumstances. (*People v. Thomas* (1990), 137 Ill. 2d 500, 516, quoting *People v. Prim* (1972), 53 Ill. 2d 62, 70.) Factors to be considered in making the determination include the age, education and intelligence of the accused, the duration of the questioning, and whether he received his constitutional rights or was subjected to any physical punishment. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 226, 36 L. Ed. 2d 854, 862, 93 S. Ct. 2041, 2047; *People v. Martin* (1984), 102 Ill. 2d 412, 427.) No single fact is dispositive;

the question must be answered on the facts of each case. *Brown v. Illinois* (1975), 422 U.S. 590, 603, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261; *People v. Hattery* (1989), 183 Ill. App. 3d 785, 821.

The established standard of review of a trial court's finding on a question of the voluntariness of a confession is whether the finding is contrary to the manifest weight of the evidence. (*Kincaid*, 87 Ill. 2d at 120; *Prim*, 53 Ill. 2d at 70.) Defendant urges that, in this case, we need not defer to the trial court's finding. He asserts, relying on *People v. Foskey* (1990), 136 Ill. 2d 66, 76, that here, since neither the facts nor the credibility of witnesses is in issue, the voluntariness of defendant's admission and subsequent confession is a question of law which this court may consider *de novo*.

In *Foskey*, this court, in reviewing the trial court's denial of the defendant's motion to suppress, considered, *de novo*, whether there were sufficient exigent circumstances to justify his warrantless arrest. (Accord *People v. Abney* (1980), 81 Ill. 2d 159, 168; *People v. Clark* (1986), 144 Ill. App. 3d 7, 11.) We note, however, that where the underlying claim of a defendant's motion to suppress concerns the voluntariness of a confession, our appellate court has declined to engage in *de novo* review, applying, instead, the "manifestly erroneous" standard. (See, *e.g., People v. Abernathy* (1989), 189 Ill. App. 3d 292; *People v. Fisher* (1988), 169 Ill. App. 3d 915.) In each instance, the appellate court has based its rejection of the standard on the fact that this court has never departed from the "manifestly erroneous" standard. *Abernathy*, 189 Ill. App. 3d at 308; *Fisher*, 169 Ill. App. 3d at 923. Compare *Abernathy*, 189 Ill. App. 3d 292, and *Fisher*, 169 Ill. App. 3d 915, with *People v. Galdine* (1991), 212 Ill. App. 3d 472 (*de novo* review of ruling on motion to suppress where underlying claim was illegality

of warrantless search), *People v. Froio* (1990), 198 Ill. App. 3d 116, and *Foskey*, 136 Ill. 2d 66.

We need not labor over the propriety of *de novo* consideration of the voluntariness of defendant's confession. Even assuming, *arguendo*, that the proper standard of review is *de novo*, our conclusion on the voluntariness issue is the same.

That said, we turn now to the particular circumstances surrounding defendant's confession. Defendant first maintains that the polygraph examiner's (Masokas') deception improperly provided the impetus for his admission to Masokas, as well as his subsequent confession to Tessmann. The State responds that Masokas did not engage in any deceptive conduct. The State supports this position with citation to the trial court's findings that Masokas' post-polygraph remarks to defendant were not false and that Masokas did not accuse defendant of lying or having failed the polygraph examination.

We disagree with the trial court's assessment of Masokas' conduct during the post-polygraph interview. Masokas testified that no responses from defendant's polygraph exam could be read. He explained that the absence of registered responses results from some conduct, such as movement or deep breathing, or a lack of cooperation by the subject. He stated that this conduct usually means that the suspect lied during the examination. According to Masokas' testimony, the lack of registered responses in this case was not the result of any of defendant's verbal responses; defendant's polygraph examination yielded no test results.

While defendant's test results, or the lack thereof, may have resulted from some interfering conduct or a lack of cooperation, this was not the information which Masokas conveyed to defendant. Masokas' accusation concerning defendant's culpability, coupled with his false statement concerning the nonexistent results, clearly

suggested to defendant that he had lied. Masokas' care in not expressly telling defendant that he lied on the polygraph exam did not diminish any inference to be drawn from his (Masokas') statements. In light of defendant's steadfast denial of any involvement in the murder until confronted with the polygraph "results," we believe that Masokas' deception largely contributed to defendant's decision to inculpate himself. Thus, contrary to the trial court's finding, we believe that Masokas' statements were deceptively designed to procure defendant's confession.

While deception weighs against a finding of voluntariness, and is relevant, it is but one factor to be considered within the totality of the circumstances in determining voluntariness. (*People v. Kashney* (1986), 111 Ill. 2d 454, 466; *People v. Martin* (1989), 102 Ill. 2d 412, 427; contra *People v. Stevens* (1957), 11 Ill. 2d 21, 27 (holding that confession obtained through trickery is inadmissible).) The fact that a confession was procured by deception or subterfuge does not invalidate the confession as a matter of law.

In *Martin*, 102 Ill. 2d at 427, the police falsely informed the defendant that another person had given a statement naming the defendant as the "triggerman." This court concluded that the deception did not vitiate the voluntariness of the defendant's confession, since the defendant had been advised of his *Miranda* rights, and he was neither subjected to lengthy interrogation nor physically abused or threatened. See also *Frazier v. Cupp* (1969), 394 U.S. 731, 739, 22 L. Ed. 2d 684, 693, 89 S. Ct. 1420, 1425 (false statement by police that defendant's codefendant had confessed, while relevant, held insufficient to make otherwise voluntary confession inadmissible); *Kashney*, 111 Ill. 2d at 466-67 (false statement to defendant by assistant State's Attorney that defendant's fingerprints were found at scene of alleged

offense insufficient to invalidate *Miranda* waiver). But see *People v. Payton* (1984), 122 Ill. App. 3d 1030, 1031-32 (where defendant was told that he had been identified by victim of crime, that his fingerprints were found at crime scene, was informed that he would be arrested if he did not make a statement, but would be released if he did, and defendant testified that he confessed because he was trying to "cut himself a deal," court held deceptively induced confession to be involuntary).

While we hasten to express our distaste for the deceptive practices employed in this case, we find that Masokas' conduct, in and of itself, was not so heavily laden with trickery as to render defendant's statement untrustworthy. (*Cf. People v. Sickley* (1983), 114 Ill. App. 3d 167; *State v. Cayward* (Fla. App. 1989), 552 So. 2d 971.) We have yet, however, to consider Masokas' deceptive conduct in conjunction with the other factors in the totality of the circumstances.

Defendant next urges us to find impropriety in the fact that Tessmann's promise "to go to bat" for defendant, while following defendant's confession of the murder, preceded defendant's later, inculpatory statements concerning the sexual assault. We find no impropriety. In our view, defendant's post-confession statements concerning the sexual assault merely constituted additional facts concerning his felonious conduct as a whole.

Further, we find *People v. Ruegger* (1975), 32 Ill. App. 3d 765, a case upon which defendant relies, to be inapposite. In *Ruegger*, promises of leniency were made to the defendant prior to his making the confession. Here, Tessmann's offer to defendant came after defendant's admission and confession.

Moreover, the record reveals that, prior to making the additional inculpatory statements, defendant was advised, a second time, of his *Miranda* rights. It is nowhere contended that defendant did not understand the

*Miranda* warnings. Further, the record does not reveal even one instance where, in response to those warnings, defendant either asserted his right to remain silent or requested the advice of legal counsel.

As we have previously stated, the trial court properly determined that defendant's interrogation was noncustodial. However, noncustodial interrogation might possibly, by virtue of some special circumstances, be characterized as one where " 'the behavior of ... law enforcement officials was such as to overbear [the suspect's] will to resist and bring about confessions not freely self-determined.' " (*Beckwith v. United States* (1976), 425 U.S. 341, 348, 48 L. Ed. 2d 1, 8, 96 S. Ct. 1612, 1617, quoting *Rogers v. Richmond* (1961), 365 U.S. 534, 544, 5 L. Ed. 2d 760, 768, 81 S. Ct. 735, 741.) Thus, even when *Miranda* warnings are not required, proof of whether some kind of warnings of defendant's constitutional rights were given is relevant evidence on the issue of whether the questioning was in fact coercive. *Beckwith*, 425 U.S. at 348, 48 L. Ed. 2d at 8, 96 S. Ct. at 1617.

Defendant here was not advised of his constitutional rights either prior to or during the interrogation which preceded his admission. However, in considering the circumstances of that interrogation, we are mindful that defendant was not threatened or mistreated during the questioning. Although the questioning was, most likely, at times rigorous and, admittedly, accusatorial, we do not equate this conduct with the coerciveness which gives rise to due process concerns.

Further, defendant was not subjected to continuous questioning during his detention. The first round of questioning began at about 9:30 a.m. and continued until about 11:30 or noon. Questioning ceased during the transport to John Reid and resumed there at about 2 p.m. The questioning continued, off and on, until about 5 p.m., when defendant made an admission. While the period of defend-

ant's detention was lengthy, the fact that the questioning for this period was not incessant is favorable on the issue of voluntariness. In this regard, it is noteworthy that this was not defendant's first encounter with the criminal justice system.

In our consideration of the relevant factors, we are also mindful that, at the time of the January 19 interrogation, defendant was 22 years of age with an overall intelligence quotient of 83, which, according to Marva Dawkins, defendant's psychiatric expert, is classified as "dull normal." However, on this record we find that defendant's will was not so overborne as to render his admission and subsequent confession incompetent. Viewing the circumstances as a whole, we believe that the trial court's finding that defendant's inculpatory statements were voluntary was not manifestly erroneous. Thus, evidence of defendant's admission and his confession were properly admissible at trial.

## II. TRIAL

Defendant contends that the trial court's preclusion of evidence concerning the circumstances surrounding his confession denied him his sixth amendment right to present a defense and his right to a fair trial. He maintains that he should have been permitted to present evidence of Masokas' deception concerning the polygraph "results." Defendant urges that the trial court's preclusive ruling prevented him from "defending against the confession."

### A. Offer of Mistrial

Initially, the State responds that defendant has abandoned this issue by electing to refuse the court's "offer" of a mistrial. We have reviewed the record in search of the court's "offer." The record reveals that the court, on one occasion, advised defense counsel that the court would

consider a motion for mistrial, if defense counsel chose to present one. On another occasion, the State inquired as to defense counsel's intention to file such a motion. Defense counsel responded that he needed to consider all of the options.

It is apparent that defense counsel never moved the court for a mistrial. We know of no rule, and the State has not directed us to one, which prescribes that the failure to move for a mistrial will result in the waiver of claimed trial errors on appeal. (But see *People v. Keagle* (1955), 7 Ill. 2d 408 (where trial court's offer to declare mistrial was made and rejected by defendant, defendant could not claim as error that the trial court refused to grant mistrial); see also *People v. Greer* (1964), 30 Ill. 2d 415, 418 (where defendant's motion for mistrial was allowed and subsequently withdrawn, defendant was not in position to allege failure on part of trial court to declare mistrial).) Accordingly, we reject the State's abandonment argument.

## B. Defense Counsel's Trial Tactics

Alternately, the State maintains that defense counsel's own trial tactics precluded introduction of the polygraph evidence, even for a limited purpose. The State argues that defendant should not be permitted to use trial tactics to force a court into allowing the admission of otherwise inadmissible evidence.

According to the State, defense counsel filed a motion *in limine* to exclude all references to the polygraph examination. The trial court granted defendant's motion and ordered the State to make no reference to either polygraph evidence or the fact that the test had been given. Subsequently, the State moved the court to order that all orders *in limine* be applied to both parties. According to the State, its motion for reciprocity was allowed. The State asserts that, despite the clear intent of the court's rulings on the motions *in limine*, defense counsel, in opening state-

ment, violated the orders *in limine* by referring to the polygraph test and the results.

The State maintains, therefore, that the trial court properly barred defendant from presenting any further evidence concerning the polygraph, and urges us to find no error. We have examined the record to determine the scope of the trial court's orders *in limine* concerning the polygraph evidence.

The record reveals that defense counsel moved the court *in limine* to bar the testimony of the polygraph examiners for fear that the jury would infer from identification of the examiners' agency that defendant took a polygraph examination. The trial court denied the motion in part, allowing the examiners to testify, but ordering that the examiners be characterized as "investigative consultants." Defense counsel argued that the court's order limited the scope of defendant's cross-examination, and defendant would be denied the right to confront witnesses as to what events transpired at the polygraph interrogation. Defense counsel further argued that unless testimony of the polygraph examiners was totally barred, defense counsel would need to confront the examiners with the full facts of the interrogation.

In response, the trial court stated that defense counsel "might want to make [the motion] all or nothing," but that the State would be barred from including any evidence or reference to polygraph examination and from using the name of the polygraphy agency. The court further stated that "if defense chooses, in their theory of the case, to raise the issue [of lie detector testing], to bring it out, that's the defense acting at their peril."

In response to the State's request for prior notice of defense counsel's intent to present the polygraphy evidence, the court stated, "What difference is it going to make if you're going to know in advance? I'm not going to

let you bring it out unless they open it up. Even if they say they're going to open it up."

The State then inquired of the court concerning what would happen if defense counsel brought up the issue of the polygraph examination in opening statement. The court responded that it was not aware that defense counsel so intended. Further, the court stated that if defense counsel did bring up the examination, then, "we'll deal with it with the witnesses." The court again stated that it did not "consider [the motion] an all or nothing, [the court] considers the defense has to make options at some times which allow things in, or where they put things in where the state couldn't." Defense counsel made no comment during this exchange.

The State further argued that the law was clear that polygraph evidence was inadmissible from either side. The court responded that defense counsel asked that the State be barred from introducing the evidence and the court allowed defense counsel's motion. The court stated that if defense counsel opened the door, then "we'll have some discussion."

It is apparent from the record that the trial court's order *in limine* did not bar defense counsel from offering the polygraph evidence. It is also apparent that defense counsel was aware of the State's concern that mention of the polygraph evidence would be made in defense counsel's opening statement. Yet, in the face of the State's expressed concerns and the trial court's statements, defense counsel stood mute. Defense counsel was certainly not required to reveal the contents of his opening statement. However, given the expressed concerns, the general rule concerning the inadmissibility of polygraph evidence, and the potential prejudicial effect of this evidence, defense counsel, in deciding to comment on this evidence, should have been guided by principles of fairness. That notwithstanding, we cannot conclude that defense counsel's tac-

tics violated the court's order *in limine* on the introduction of the polygraph evidence.

Additionally, we note that in June 1989, several months prior to the hearing on defendant's motion *in limine* on the polygraph evidence, the State moved the court for reciprocal application of all orders *in limine*. Our review of the record, however, has not revealed a responsive order on the State's June motion. At any rate, at the hearing on defendant's motion *in limine*, both the trial court and the State proceeded as though there had been no prior motion or order for reciprocal application. In fact, in response to the trial court's emphatic identification of the motion *in limine* on the polygraph evidence as defendant's, the State responded that it would file a motion seeking reciprocal application. Subsequent to the court's order *in limine* on defendant's motion, the State did file a motion. However, the State sought only reconsideration of the court's order disallowing the use of the name of the polygraph agency.

Resolution of whether defense counsel's conduct was violative of the court's order *in limine* leaves, yet, unanswered the question of what effect this conduct had on defendant's trial. Generally, it is prejudicial error to relate inadmissible evidence in an opening statement with apparent disregard of its subsequent inadmissibility. (See *Gillson v. Gulf, Mobile & Ohio R.R. Co.* (1969), 42 Ill. 2d 193, 200.) However, while we believe that any error here was harmless, since, as we discuss later, defendant's convictions must be reversed, we need not give the matter further consideration.

## C. Preclusion of Polygraph Evidence

We turn now to the greater issue of whether defendant was denied a fair trial as a result of the trial court's preclusion of the polygraph evidence. During the course of trial, defense counsel moved the court to allow the introduction of evidence regarding the circumstances of defend-

ant's confession, including evidence that defendant had taken a polygraph examination. The trial court, concerned with the prejudicial effect of the polygraph evidence, barred defendant from introducing it.

We are aware that the term "polygraph evidence," broadly construed, may include every aspect concerning polygraphy, including results. However, defendant's contention on appeal confines our review to a limited aspect of polygraph evidence, *viz.*, the admissibility of the fact and the circumstances of the polygraph examination. It bears repeating that, in this case, defendant's polygraph examination yielded no results.

We begin our analysis with a recitation of the basic principles regarding confessions. The circumstances surrounding the taking of a confession can be highly relevant to the legal question of voluntariness as well as the factual question of the defendant's guilt or innocence. (*Crane v. Kentucky* (1986), 476 U.S. 683, 689, 90 L. Ed. 2d 636, 644, 106 S. Ct. 2142, 2146.) Thus, a defendant in a criminal case has a right at trial to present evidence concerning the circumstances of his confession. See *Crane*, 476 U.S. at 687-89, 90 L. Ed. 2d at 643-45, 106 S. Ct. at 2145-46; see also *People v. Burbank* (1972), 53 Ill. 2d 261, 269.

A confession may be shown to be "insufficiently corroborated or otherwise *** unworthy of belief." (*Lego v. Twomey* (1972), 404 U.S. 477, 485-86, 30 L. Ed. 2d 618, 625-26, 92 S. Ct. 619, 625.) However, "stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" (*Crane*, 476 U.S. at 689, 90 L. Ed. 2d at 644, 106 S. Ct. at 2146.) A defendant's case may stand or fall on his ability to persuade the jury that the manner in which the confession was obtained casts

doubt on its credibility. *Crane*, 476 U.S. at 689, 90 L. Ed. 2d at 644, 106 S. Ct. at 2146.

We have consistently held that the results of a polygraph examination are inadmissible when offered in evidence for the purpose of establishing the guilt or innocence of a defendant. (*People v. Zazzetta* (1963), 27 Ill. 2d 302.) In Illinois, this is the prevailing rule, regardless of which party seeks their introduction (see *People v. Virner* (1978), 74 Ill. 2d 329, 347; *People v. Nicholls* (1969), 42 Ill. 2d 91, 97) and even if the parties have so stipulated (*People v. Baynes* (1981), 88 Ill. 2d 225). However, we have not, prior to this case, had occasion to expressly address the propriety of the admissibility of the fact and the circumstances surrounding a polygraph examination when such evidence is offered on the issue of the reliability of a confession.

While the majority of States continue to exclude evidence of the fact, details or the results of a polygraph examination (see Annot., 23 A.L.R.2d 1306 (1952)), some States have departed from a *per se* inadmissibility approach in special circumstances. In particular, in those jurisdictions where the question of the voluntariness of a confession is decided independently by both the judge, during pretrial, and the jury, during trial, the admissibility of polygraph evidence has not been completely barred. Since, in these instances, in addition to the trial court's pretrial determination, the jury must consider the totality of circumstances surrounding a confession in determining voluntariness, the fact that a defendant submitted to a polygraph examination is held admissible as relevant and necessary to a determination on that issue. (See *Whalen v. State* (Del. 1981), 434 A.2d 1346 (Delaware Supreme Court held polygraph evidence offered by prosecution admissible as relevant factor to be considered in jury's assessment of voluntariness of defendant's confession). Accord *Johnson v. State* (1976), 31 Md. App. 303, 355 A.2d

504 (evidence offered by defendant); *State v. Bowden* (Me. 1975), 342 A.2d 281 (evidence offered by prosecution); *cf. State v. Green* (1975), 271 Or. 153, 531 P.2d 245 (evidence offered by prosecution on issue of voluntariness held to be prejudicial; evidence only admissible when offered by defendant).) However, where improper inferences have been made to results (*State v. Melvin* (1974), 65 N.J. 1, 319 A.2d 450 (evidence offered by prosecution)) or where the prejudicial effect outweighs the probative value (*Johnson v. State* (Fla. App. 1964), 166 So. 2d 798 (evidence offered by prosecution)), such evidence has been held inadmissible.

Similarly, several Federal courts have reevaluated their stance on the general rule of inadmissibility of polygraph evidence and have taken a more liberal approach to the introduction of such evidence. In the leading case, *Tyler v. United States* (D.C. Cir. 1951), 193 F.2d 24, the defendant contended that his confession resulted from police coercion. The police officer was permitted to testify that a lie detector examination showed that the defendant had been lying. Following this testimony, the trial court gave a limiting instruction to the jury admonishing it that the polygraph evidence was only admitted on the issue of the circumstances leading to the defendant's confession, and not as proof that the defendant was lying. The court of appeals affirmed, finding the evidence relevant to the vital question of voluntariness and holding that the limiting instruction obviated any prejudicial effect.

*United States v. Kampiles* (7th Cir. 1979), 609 F.2d 1233, followed *Tyler*. In *Kampiles*, the court upheld a trial court's ruling that if the defendant sought to challenge, at trial, the voluntariness of his confession, then the prosecution would be permitted to introduce evidence that the defendant confessed after being told that he had failed a polygraph. The court held that there was no error, observing, "It would have been unfair to allow defendant to

present his account of his admissions, *** without allowing the Government to demonstrate the extent to which failure of the polygraph precipitated the confession." (*Kampiles*, 609 F.2d at 1244.) The court held that the limited use of the polygraph evidence was proper. See also *United States v. Hall* (10th Cir. 1986), 805 F.2d 1410 (where defendant was warned in advance that if he sought to impugn the quality of government's investigation, government would be permitted to introduce evidence that defendant failed polygraph exam; court found admission of such evidence proper).

Our appellate court, in *People v. Jackson* (1990), 198 Ill. App. 3d 831, has also examined the limited admissibility of polygraph evidence. Defendant urges us to adopt the holding in *Jackson*. While the State maintains that defendant should not prevail on appeal, it, nonetheless, asserts that *Jackson* is "good law," and urges affirmance.

At trial in *Jackson*, the defendant testified that his confession was coerced by repeated threats of physical violence. In rebuttal, the State introduced testimony that the defendant confessed shortly after he was told that he had failed a polygraph examination. The trial court, relying on *People v. Triplett* (1967), 37 Ill. 2d 234, instructed the jury that the polygraph evidence was not to be used as evidence of the defendant's credibility but, rather, to determine whether his confession had been voluntarily given.

On appeal, the defendant, Jackson, contended that the trial court erred in allowing the jury to hear evidence that he had failed a polygraph examination. The defendant maintained, citing *People v. Baynes* (1981), 88 Ill. 2d 225, and *People v. Yarbrough* (1982), 93 Ill. 2d 421, that this court has held polygraph evidence inadmissible for any purpose. The appellate court distinguished *Baynes* (polygraph results inadmissible even if admissibility stipulated to by parties) and *Yarbrough* (reliance upon polygraph results in ruling on post-trial motion wherein sufficiency of

evidence is raised held impermissible), finding that neither case dealt with the admissibility of polygraph evidence for the limited purpose of determining the voluntariness of a confession. The court held that the evidence was admissible for the purpose of showing that it was the defendant's failure to pass the polygraph examination, rather than his alleged threats of violence, which induced his confession.

*Jackson* relies for its holding upon *Triplett*, which we, therefore, consider. During a suppression hearing in *Triplett*, a deputy sheriff gave unsolicited testimony that the defendant had requested and submitted to a polygraph examination. At his jury trial, the defendant testified on cross-examination that he agreed to take the polygraph exam and that he was told that the test showed that he was lying. Defense counsel's motions for a mistrial and for the court to instruct the jury to disregard the testimony were denied.

On appeal, the State argued that the polygraph evidence was admissible on the issue of the voluntariness of the confession. The court stated that while there is a "strong aversion [to polygraph evidence], it can be argued that a different result should follow when the issue is the voluntariness of a confession. It can be said that the fact that the confession followed a polygraph examination is a relevant circumstance and that it is the fact of the examination, rather than its result, that is significant." (*Triplett*, 37 Ill. 2d at 239.) The court held that since there had been no limiting instruction to the jury on the use of the evidence, a new trial was required.

In Illinois, the procedure for the determination of the admissibility of a confession requires that the preliminary inquiry into the voluntary nature of the confession is for the trial court. (*People v. Higgins* (1972), 50 Ill. 2d 221, 225.) Only the question of the credibility of a confession is submitted to the jury. (Ill. Rev. Stat. 1987, ch. 38, par. 114—11(f); see also *People v. Pecoraro* (1991), 144 Ill. 2d 1,

11.) A defendant is not entitled to relitigate the issue of voluntariness before the jury after the trial court has determined its admissibility. See *People v. DeSimone* (1963), 27 Ill. 2d 406, 409; 5 L. Pieczynski, Illinois Practice §12.25 (1989).

To follow the reasoning in *Triplett* and, therefore, *Jackson*, allowing submission of evidence to the jury on the issue of the voluntariness of a confession, would be contrary to the procedure in Illinois. Yet, we can agree with *Jackson* and *Triplett* on the value of limited admissibility of polygraph evidence in special circumstances. However, given the ordinarily prejudicial effect of polygraph evidence, the broader holding of *Jackson*, which would permit the *State* to offer polygraph evidence to rebut a defendant's assertion that his confession was coerced, gives us pause. (See *State v. Green* (1975), 271 Or. 153, 531 P.2d 245 (polygraph evidence only admissible when offered by defendant).) Nevertheless, since *Jackson* presents a different factual scenario, we need not determine the propriety of its broader holding.

We believe that *People v. Lettrich* (1952), 413 Ill. 172, a case decided long before *Jackson* or *Triplett*, better supports our resolution of the issue here. In *Lettrich*, the State relied, for conviction, upon the repudiated confession of the defendant. The trial court ruled that the confession had been voluntarily given. At trial, the defendant attempted, on cross-examination, to elicit testimony from a witness, Walsh, concerning questions asked of him while "the polygraph machine was being used." The witness stated that he could not do that without examining his records, which would take 15 minutes. The court refused to allow the witness to examine his records. *Lettrich*, 413 Ill. at 177-79.

On review, the supreme court found that the trial court unduly restricted the defendant's cross-examination of the witness. Given that many of the statements in the confes-

sion, the only evidence connecting the defendant to the crime, did not conform to known facts about the crime, the court deemed liberal opportunity for cross-examination to be imperative. *Lettrich,* 413 Ill. at 178.

The *Lettrich* court did not expressly rule on the propriety of the admissibility of the polygraph evidence. However, we believe that its approval of the admissibility of such evidence is implicit. Our belief is supported by the fact that the court stated that the defendant should have been permitted to show all of the circumstances surrounding his questioning by the witness, Walsh, including the nature and extent of the questioning. (*Lettrich,* 413 Ill. at 178.) Additionally, the court stated that "justice requires that the jury consider every circumstance which reflects upon the *reliability* of that confession." (Emphasis added.) (*Lettrich,* 413 Ill. at 179.) One of the circumstances surrounding the defendant's questioning included the questioning while the "polygraph machine was being used."

Here, the State relied largely, for conviction, upon the defendant's confession, which similarly to the confession in *Lettrich,* fails at least in one respect to conform to a known fact. (Contrary to defendant's "verbatim" statement, that defendant had wiped the blood from the knife on a tissue and threw the tissue behind a television in the basement of his home, the blood-stained tissue was actually found behind a bookcase in the basement of the victim's home.) Other evidence of defendant's guilt consisted of an admission which he allegedly made to Susan Holloway. Of all of the physical evidence collected, the only evidence to connect this defendant to the crime scene were three glass fragments taken from defendant's shoes. These glass fragments, according to the State's forensic science witness, "had similar refractive indexes" to fragments taken from the shattered glass at the victim's home, but could not be absolutely identified as having come from that source.

We believe that the exclusion of the polygraph evidence here deprived defendant of his fundamental right to a fair opportunity to present a defense. Fundamental justice requires that the defendant have every opportunity to controvert the State's proof. Defendant has a right, regardless of how substantial or infirm the evidence against him, to familiarize the jury with every circumstance attendant to the State's obtention of his confession. (See *Lego v. Twomey* (1972), 404 U.S. 477, 485-86, 30 L. Ed. 2d 618, 625, 92 S. Ct. 619, 625.) Thus, we hold that the polygraph evidence should have been admitted for the limited purpose of determining the credibility and reliability of the confession. *Cf. State v. Schaeffer* (Minn. 1990), 457 N.W.2d 194 (where the trial court admits the confession, the trial court must permit the jury to hear evidence on the circumstances surrounding the making of the confession for a determination of weight and credibility; thus, notwithstanding the general inadmissibility of polygraph evidence, the trial court did not err in permitting defense counsel to present such evidence).

## III. CONCLUSION

Since defendant was precluded from fully presenting his defense, reversal of his convictions and retrial is required. At retrial, defense counsel, if he so chooses, should be permitted to offer evidence of the fact of the polygraph examination, and the surrounding circumstances, as well as the fact of the nonexistence of any results from that examination.

Our resolution of this issue is not without regard for the potential prejudicial effect of polygraph evidence. Nevertheless, the importance of permitting the jury to weigh the effects of every motivating circumstance surrounding the obtention of defendant's confession outweighs the importance of avoiding the possible prejudice. However, because of the potential prejudicial effect, any attempt, by

either defendant or the State, to explain the nonexistence of the results or to refer to specific questions posed during the course of the examination is barred.

In order to further minimize any potential prejudicial effect of the polygraph evidence, the jury should be instructed concerning the limited purpose of its admissibility. The evidence is to be considered solely for the purpose of determining the credibility and reliability of the confession. The jury should be admonished not to speculate upon the nonexistence of results on the issue of defendant's guilt or innocence. Finally, the jury should be given any other appropriate instructions concerning the polygraph evidence which are not inconsistent with this opinion.

We do not here, today, announce a general rule on the admissibility of polygraph evidence. We, instead, reserve the opportunity to revisit our position on the general inadmissibility of such evidence as particular issues are presented in future cases. We remain firm in our position that the fact, details or results of a polygraph examination are generally inadmissible on the issue of guilt or innocence.

Finally, defendant posits several additional arguments concerning trial errors, some of which may be valid, and which may recur at retrial. However, since we reverse on one issue, we deem consideration of defendant's additional arguments to be advisory and, therefore, we decline review. We trust that, upon retrial, care will be taken to avoid repetition of any such errors.

For the forgoing reasons, we reverse defendant's convictions and remand this cause for retrial.

*Convictions reversed;*
*cause remanded with directions.*