THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GARY D. MATNEY, Defendant-Appellant.

Second District    No. 2—96—0306

Opinion filed November 6, 1997.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Kathleen T. Zellner and Douglas H. Johnson, both of Kathleen T. Zellner & Associates, of Naperville, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Anthony J. Peraica, of Chicago, for the People.

JUSTICE INGLIS delivered the opinion of the court:

Following a jury trial, defendant, Gary D. Matney, appeals his conviction of first-degree murder (720 ILCS 5/9—1(a)(1), (a)(2) (West 1994)). On appeal, defendant contends that (1) the trial court erred in denying his motion to suppress statements; (2) the trial court erred in giving the jury instructions over defendant's objections regarding defendant's failure to testify; and (3) he received ineffective assistance of trial counsel. We affirm.

This case arose from the death of Ronald Pecore, who was killed by a train on July 7, 1995. During police questioning, defendant confessed to knocking the victim unconscious and placing him on the railroad tracks. Prior to trial, he brought a motion to suppress those statements.

At the motion to suppress, Detective Theodore Meeker of the Hainesville police department testified that he initially investigated the victim's death as a suicide. He learned that the victim had been living at a campsite about 480 feet from the railroad tracks and that Officer Michael Wisniewski recovered a citation with defendant's name on it from a cigarette package on the path leading from the railroad tracks to the campsite.

To help in his investigation surrounding the victim's death, Meeker sought defendant for questioning. Accompanied by Wisniewski and Officer John Sapyta, Meeker found defendant at a bar around 1 a.m. on July 8, 1995. Defendant voluntarily complied with Meeker's request to question him. Defendant was not placed under arrest, and none of the officers drew weapons or handcuffed him.

At the Hainesville police station, the officers gave defendant cof-

fee and cigarettes, allowed him to use the bathroom, and never prohibited him from leaving. Defendant informed Meeker that he had consumed in excess of a case of beer during the day. Meeker testified that defendant appeared normal, rational, and coherent. Defendant's breath moderately smelled of alcohol and his eyes were red. Meeker testified that defendant "seemed like he had had a little bit to drink, but other than that, he walked fine; he didn't stumble or stagger or anything like that." In his opinion, defendant did not appear to be under the influence of alcohol. Meeker further testified that defendant was experienced with the criminal justice system, having been arrested approximately 20 times before.

Defendant told Meeker that he and the victim had been good friends. When Meeker asked defendant when he last saw the victim, defendant first responded that it had been several days and then he replied that it had been two days. Finally, defendant said that he was drinking with the victim the day before and that he and the victim were arguing because the victim stole money from defendant and food stamps from defendant's girlfriend. In response to how he felt about this, defendant replied that he was "mad enough to kill" the victim.

At that point, Meeker stopped the interview and read defendant his *Miranda* rights. Defendant stated that he understood those rights and agreed to continue talking. Defendant never signed a written waiver of his rights.

Detectives Daniel Colin and John Crilly of the Lake County sheriff's department were called to interview defendant. Meeker informed Crilly that he gave defendant *Miranda* warnings. Defendant told the detectives that he drank a case of beer throughout the day, which was normal for him. Both detectives testified that it was apparent that defendant had had some drinks but that he did not appear to be intoxicated. Defendant did not slur his speech, stumble, or lose his balance. They stopped the interview several times to let defendant have coffee, cigarettes, and use the washroom. Crilly testified that defendant understood what they were asking, and defendant spoke clearly to them. Defendant did not request an attorney or seek to stop the interview.

After the detectives questioned defendant at the Hainesville police station, they transported defendant to the Lake County sheriff's department to audiotape the interview. Before Colin began taping, he asked defendant if he recalled receiving *Miranda* rights. Defendant hesitated, and, after Meeker reminded him of the event, he stated that he remembered. After Colin turned on the tape, he again asked defendant if he previously was advised of his *Miranda* rights and de-

fendant stated, "I can't remember; I am pretty sure they did; pretty sure they did."

During the taping, defendant related different stories, including that he and the victim had argued over money that the victim had stolen but quickly reconciled. Afterwards, they went to the campsite near the railroad tracks and began to fight again. Following a second reconciliation, defendant and the victim walked along the railroad tracks where once again they fought. Defendant admitted that he knocked the victim unconscious and dragged him to the railroad tracks and laid him on the tracks in front of an oncoming train.

Several witnesses testified for defendant at the suppression hearing. Defendant's mother, Genevieve Webb, stated that on July 8, 1995, she and defendant, who lived with her, drank an excessive amount of beer and wine coolers throughout the day from 12:30 to 9 p.m. She believed that defendant was very drunk that night. Defendant's brother, Thomas Matney, testified that, when he saw defendant that day, he was extremely intoxicated. Matney stated that defendant was an alcoholic and was frequently intoxicated. He also stated that his mother appeared extremely intoxicated. Defendant's friend, Cody Broten, visited defendant around 8 p.m. that evening. He had several beers before he arrived. He stated that he drank 8 to 10 beers and defendant drank at least 12 in a two-hour period. He believed that defendant was intoxicated. Defendant's neighbor, Jim Spaulding, observed defendant around 9 p.m. and he believed that defendant was intoxicated.

Dr. Steven Rothke, a clinical neuropsychologist, testified for the defense. He conducted several tests on defendant. In Dr. Rothke's opinion, defendant's history of head trauma and alcohol and drug abuse, coupled with his low intelligence, resulted in significant cognitive deficits. He believed that those deficits rendered defendant unable to intelligently and knowingly waive his *Miranda* rights at the time he gave his confession.

Dr. Henry Lahmeyer, a psychiatrist, testified for the State. His examination of defendant included asking defendant the actual *Miranda* questions. In his opinion, defendant's response to the *Miranda* questions indicated that he was able to cognitively understand them. In response to other questions, defendant understood the various roles that people played at trial. In particular, he understood the difference between a prosecutor and a defense attorney. Defendant understood that it is better to hire a private attorney than use a public defender because "you get what you pay for." Dr. Lahmeyer opined that a person with a low intelligence quotient does have limited abstract reasoning but would not be precluded from knowingly, vol-

untarily, and intelligently waiving *Miranda* warnings. He further found no evidence of acute organic brain disease or evidence that consuming a case of beer each day affected defendant's ability to recall, recollect, or form the thought processes to knowingly, voluntarily, and intelligently waive *Miranda* rights.

The trial court denied the motion to suppress, holding that defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights. The court first found that defendant was not mentally or psychologically impaired from voluntarily waiving his rights. The trial court emphasized that Dr. Lahmeyer's test to defendant, and defendant's responses to the *Miranda* questions, clearly showed defendant's understanding of those rights. In denying the motion, the court further relied on defendant's familiarity with the criminal law system because he had been arrested more than 20 times.

The court also found that alcohol did not impair defendant to the extent that he could not knowingly, voluntarily, or understandingly waive his *Miranda* rights. After listening to the taped interview, it was clear to the court that defendant understood and was responsive to the questions. The court commented that defendant did not slur his words, seemed to be in control of his faculties, and could not have expressed himself better than he did.

The evidence elicited at the motion to suppress was essentially repeated during the trial. In addition, the following evidence was revealed.

About 1:20 a.m., July 7, 1995, Dennis Dietz was operating a Metra train when he noticed the victim's body partially lying on the railroad tracks. He did not see the body move. Dietz could not stop the train until 10 to 15 seconds after it hit the victim's head. Dietz notified Metra, Metra police, and the local paramedics.

Officer Sapyta was dispatched to the scene around 1:40 a.m. He found the body on an embankment by the tracks. He investigated the scene with Officer Wisniewski.

Dr. Eupil Choi, a forensic pathologist, performed an autopsy on the victim's body. Choi saw traumatic injuries consistent with being struck and dragged by a train. He believed that the victim was alive before he was hit by the train. The victim's toxicology report indicated a blood-alcohol level of 0.244 at the time of death. The report also indicated that Pecore suffered from cirrhosis of the liver and that Pecore had taken Valium sometime before his death.

Meeker testified that defendant kept changing his story. Defendant first told him that the victim laid himself on the railroad tracks and told defendant that he wanted to kill himself. Defendant told Meeker that he tried to get the victim off the tracks but could not and he left when he saw a train coming.

Detective Colin testified that during questioning and during the audiotaped interview defendant gave two or three different versions about the incident. The versions centered on where the fight took place, where he left the victim, and whether he dragged the victim back to the tracks. The last version that defendant told him was that he fought with the victim, knocked him out, and dragged the victim onto the tracks because he was afraid of the victim and the threats the victim made to defendant's family and his mother. During cross-examination, Colin stated that defendant told him of the victim's violent temper and past criminal activities. The jury then heard the audiotaped interview and received a transcript of the tape. (We note that neither the tape nor the transcript was made a part of the record on appeal.)

Officer Sapyta worked part time for the Hainesville police department and also at the Lake County jail. He was informed that Eugene Spruille, an inmate at the Lake County jail, had information on the victim's death. Sapyta advised Detectives Crilly and Meeker that Spruille wished to be interviewed. Sapyta never spoke to Spruille about this. He did not recall ever seeing Spruille at the Lake County jail.

Spruille, who was awaiting sentencing on two counts of unlawful possession of a controlled substance and one count of theft, testified that on July 15, 1995, defendant spoke to him. He and defendant sat near each other while they were both watching television at the Lake County jail. According to Spruille, defendant asked him whether the police would be able to use a confession which was given while under the influence of alcohol. Defendant told him that he and another man had been drinking and taking Valium and had an argument. Defendant told Spruille that he had "pounded and pounded the guy" and thought that he killed him. Hearing the train, defendant decided to drag the victim onto the train tracks to make it look like a suicide. Defendant then told Spruille that he had been caught because the police found a citation that he left at the scene.

According to Spruille, no offers had been extended to him at the time he gave his statement to Detective Crilly. He never spoke to any other police officer or assistant State's Attorneys. After he gave his statement, he asked for drug treatment and agreed to testify against defendant in exchange for a nine-year reduction of his possible maximum sentence and dismissal of the theft charge.

During defendant's case in chief, Debbie Campbell, the victim's sister, testified that defendant and her brother had been friends for approximately 10 years. Defendant's mother also testified to the friendship between her son and the victim and that until the victim's

death, she had had an extramarital affair with the victim for approximately nine years. She further related that in 1987 the victim threatened to blow up her house.

Steven Trovillion testified that in June 1995 the victim told him that he wanted to commit suicide. Trovillion had actually witnessed the victim, who was intoxicated, attempt to commit suicide by lying on the railroad tracks. Trovillion further testified to defendant's propensity to be a peaceful, calm, and nonviolent person. Paul Smith also testified that, shortly before Pecore died, he twice saw Pecore, while drunk, attempt suicide by lying on the railroad tracks. Broten testified that defendant had a reputation for being a peaceful person and the victim was known as a violent person.

Before the defense rested, the trial court allowed defendant to publish to the jury the victim's certified convictions of the offenses of battery and armed robbery.

The jury found defendant guilty of first-degree murder, and the trial court sentenced defendant to 45 years' imprisonment. After a motion to reconsider sentence was denied, defendant filed this timely appeal.

Defendant first contends that the trial court erred in denying his motion to suppress. Specifically, defendant asserts that his organic brain injury, low intelligence quotient, and intoxication during questioning rendered him incapable of understanding his rights.

■ In reviewing a trial court's determination on a motion to suppress, the parameters of our review are limited. Our function is not to reweigh the evidence; our function is to determine if the trial court's finding was against the manifest weight of the evidence. *People v. Bernasco*, 138 Ill. 2d 349, 368 (1990); *People v. Reynolds*, 94 Ill. 2d 160, 165 (1983). It is the function of the trial court to determine the credibility of the witnesses and to resolve any conflict in their testimony. *People v. Melock*, 149 Ill. 2d 423, 432 (1992).

■ In general, statements made during a custodial interrogation cannot be admitted into evidence unless the suspect is given *Miranda* warnings and intelligently and knowingly waives the right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 706-07, 86 S. Ct. 1602, 1612 (1966); *People v. Laliberte*, 246 Ill. App. 3d 159, 167 (1993). Whether a defendant intelligently waived his rights depends upon the particular facts and circumstances surrounding each case, including the background, experience, and conduct of the accused. *People v. Martin*, 102 Ill. 2d 412, 425 (1984).

■ Defendant relies on the principles set forth in *Bernasco*. In *Bernasco*, the supreme court held that the manifest weight of the evidence did not contradict the trial court's finding that the defendant's

low level of intelligence prevented him from making an intelligent *Miranda* waiver. The trial court reached its conclusion after hearing police, parental, and psychological testimony, and, what was most significant to the supreme court, after the trial court made its own observations of defendant while he was testifying. *Bernasco*, 138 Ill. 2d at 368. The supreme court noted that the cases presented by the State offered little support since the validity of a waiver of rights is essentially a question of fact. *Bernasco*, 138 Ill. 2d at 368.

In the present case, we do not find that the manifest weight of the evidence contradicts the trial court's finding that defendant knowingly and intelligently understood his *Miranda* rights. This conclusion is supported by police and psychological testimony, the audiotaped statements made by defendant, as well as the trial court's personal observations.

We also find that the cases cited by defendant offer him little support. Each case stands on its own particular facts and circumstances. Accordingly, we cannot conclude that the trial court's finding that defendant knowingly and intelligently waived his *Miranda* rights was against the manifest weight of the evidence.

■ Defendant next contends that the trial court erred in giving the jury instruction, over his objection, regarding defendant's failure to testify. Illinois Pattern Jury Instructions, Criminal, No. 2.04 (3d ed. 1992) (hereinafter IPI Criminal 3d No. 2.04). Within minutes after the jury retired to deliberate, the prosecutor informed the trial court that it forgot to instruct the jury that defendant need not testify. Defense counsel stated that the instruction is given only when submitted by the defense and that he chose not to submit it, arguing that it would be prejudicial if the jury were called back out just to hear the instruction. The trial court, however, was concerned that the jury would wonder why the instruction was not given since it was previously instructed during *voir dire* that one of defendant's basic rights was that he did not have to testify and that if he did not testify it could not be held against him. The jury was then called out and the trial judge informed it that he inadvertently failed to give it an instruction, which the judge then read.

Defendant claims that bringing the jury back to read the instruction after it had retired unduly highlighted defendant's failure to testify thereby prejudicing him. He equates the trial court's actions to those cases where an impermissible comment by the State that indirectly or directly refers to a defendant's failure to testify is apt to constitute reversible error, unless such comment is found to be harmless error beyond a reasonable doubt.

A similar argument was rejected by the Supreme Court in *Lake-*

*side v. Oregon*, 435 U.S. 333, 55 L. Ed. 2d 319, 98 S. Ct. 1091 (1978). There, the defendant argued that the trial court erred in instructing the jury, over his objection, that the defendant's failure to testify should not be considered in determining the question of guilt or innocence. The defendant maintained that whatever beneficial effect such an instruction may have in most cases, in other cases it may encourage the jury to draw adverse inferences from a defendant's silence, and, therefore, it cannot constitutionally be given in any case when a defendant objects to it. *Lakeside*, 435 U.S. at 339, 55 L. Ed. 2d at 325, 98 S. Ct. at 1095.

The Supreme Court observed that a prosecutor's remarks that encourage the jury to draw inferences from the defendant's failure to respond to the testimony against him is different from a jury instruction. In the former instance, the jury draws an adverse inference, while in the latter instance, the judge's instruction removes from the jury's deliberations any influence of unspoken adverse inferences. The court discerned that if the defendant's position were followed it "would require indulgence in two very doubtful assumptions: First, that the jurors have not noticed that the defendant did not testify and will not, therefore, draw adverse inferences on their own; second, that the jurors will totally disregard the instruction, and affirmatively give weight to what they have been told not to consider at all." *Lakeside*, 435 U.S. at 340, 55 L. Ed. 2d at 325, 98 S. Ct. at 1095. The court could not accept these speculative assumptions. Instead, it observed that the very purpose of a jury charge is to flag the jurors' attention to concepts that must not be misunderstood, such as reasonable doubt and burden of proof, and that to instruct the defendant in the meaning of self-incrimination is no different. *Lakeside*, 435 U.S. at 340, 55 L. Ed. 2d at 326, 98 S. Ct. at 1095. The court cautioned that each state is free to forbid its trial judges from doing so as a matter of state law. However, it held that the giving of such an instruction over the defendant's objection does not violate the privilege against compulsory self-incrimination guaranteed by the fifth and fourteenth amendments. *Lakeside*, 435 U.S. at 340-41, 55 L. Ed. 2d at 326, 98 S. Ct. at 1095.

Following the rationale of *Lakeside*, the Appellate Court, First District, in *People v. Cunningham*, 177 Ill. App. 3d 544 (1988), held that the trial court did not err when it read Illinois Pattern Jury Instructions, Criminal, No. 2.04 (2d ed. 1981) to the jury *sua sponte*. The court observed that Illinois courts have held that the provision of article I, section 10, of the Illinois Constitution of 1970 and the provision of the fifth amendment to the Constitution of the United States are given the same construction. The court also pointed out

that decisions of the Supreme Court construing the fifth amendment are authoritative in construing article I, section 10, of the Illinois Constitution and held that the giving of the instruction did not violate the defendant's rights under the Illinois Constitution or deprive defendant of a fair trial. *Cunningham*, 177 Ill. App. 3d at 552.

The *Cunningham* court further distinguished *People v. Anderson*, 153 Ill. App. 3d 542 (1987), *People v. Hicks*, 101 Ill. App. 3d 238 (1981), and *People v. Lee*, 44 Ill. App. 3d 43 (1976). The court found that, although these cases held that it is error to give the instruction over a defendant's objection because of constitutional implications, none of these cases considered the effect of the decision in *Lakeside*. Therefore, the court found that it would be inappropriate to defer to these decisions. *Cunningham*, 177 Ill. App. 3d at 552. We choose to follow *Lakeside* and *Cunningham* and, thus, hold that the giving of IPI Criminal 3d No. 2.04 over a defendant's objection does not amount to constitutional error.

■ Even if we were to assume that the giving of the instruction over defendant's objection was error, we fail to see how defendant was prejudiced in this case. Preliminarily, we note that defendant does not challenge the sufficiency of the evidence. Moreover, we cannot say that, if it were error, the error contributed to defendant's conviction, for it is presumed that the jury would understand and heed the court's directives concerning matters such as presumption of innocence, reasonable doubt, and failure to testify. *People v. Whitehead*, 169 Ill. 2d 355, 404 (1996). Defendant has not shown that this directive was ignored and we will not presume otherwise.

Defendant last contends that he received ineffective assistance of trial counsel because trial counsel did not question two defense witnesses concerning specific bad acts of the victim. Prior to trial, defense counsel filed a motion *in limine* to introduce evidence of the victim's past violent behavior and the victim's criminal convictions. This evidence was probative of the victim's aggressive and violent character and corroborative of defendant's claim that the victim was the initial aggressor. In particular, defense counsel requested that the victim's prior criminal records be published to the jury and indicated that witness Trovillion could testify to a knifing by the victim, and that witness Broten could testify to an incident in which the victim placed a shotgun to his own head. The trial court granted the motion. Defendant claims that defense counsel highlighted the proposed evidence about the specific bad acts in the opening statement but that the two witnesses only testified about the victim's violent nature. Defendant claims that the failure to present this crucial evidence greatly prejudiced him because the evidence would have clearly illustrated how much defendant feared the victim.

■ In order to render counsel's assistance ineffective, a defendant must establish that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, were it not for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Albanese*, 104 Ill. 2d at 525. The deficiency in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance. *Whitehead*, 169 Ill. 2d at 380. An insufficient showing on either the performance component or the prejudice component of an ineffective assistance claim will defeat the constitutional claim. *Whitehead*, 169 Ill. 2d at 380-81.

■ We do not find that defendant has shown that the failure to introduce the two specific bad acts was prejudicial under the second prong of *Strickland.* We conclude that there is no reasonable probability that, absent trial counsel's alleged deficiency, the jury would have found otherwise. Defendant confessed that he killed the victim. His confession was corroborated by other evidence introduced at trial. Defendant has failed to show that the introduction of the two specific bad acts would have produced a different result. We thus conclude that defendant was not denied the effective assistance of counsel.

Accordingly, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

McLAREN and HUTCHINSON, JJ., concur.