THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. CAROLYN HAWTHORN, Defendant-Appellee.

First District (5th Division)   No. 1—90—1515

Opinion filed April 8, 1993.—Rehearing denied May 26, 1993.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Gael M. O'Brien, Assistant State's Attorneys, of counsel), for the People.

Michael J. Pelletier and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellee.

JUSTICE COUSINS delivered the opinion of the court:

The People of the State of Illinois appeal from the circuit court's order suppressing certain inculpatory statements made by the defendant, Carolyn Hawthorn (Hawthorn). After an evidentiary hearing, the circuit court found that Hawthorn had been subject to a custodial interrogation without the requisite *Miranda* warnings. The circuit court held that the statements made during this interrogation were inadmissible because they were obtained in violation of the defendant's fifth and sixth amendment rights. In addition, the circuit court held that the defendant's subsequent statements must be suppressed pursuant to the fruit of the poisonous tree doctrine.

We reverse.

BACKGROUND

On July 16, 1986, the body of Glen Johnson was found in a dumpster in Skokie, Illinois. Johnson had been beaten and shot with a .32-caliber gun.

The Skokie police detectives ascertained that Johnson had been the defendant's boyfriend and had lived with the defendant and her two sons until the date of his death. From July until September 4, 1986, the detectives spoke with Hawthorn approximately a dozen times. They discussed the murder with her and questioned her about Johnson's habits, friends, and "hang outs." Sometimes they went to Hawthorn's home or office, other times she came to the police station. The police subpoenaed her telephone records for the entire month of July to find out what phone calls were made by Hawthorn and Johnson. In addition to Haw-

thorn, the police interviewed about 100 to 200 other individuals in connection with the investigation.

During their investigation the police learned that there had been fights between Hawthorn and Johnson, and that Johnson had caught Harry Ollie, another boyfriend of Hawthorn, in her bedroom. Ollie told the police that he had given Hawthorn a .32-caliber gun to use as protection against Johnson. The police learned that Ollie had taken an unauthorized leave from his job on July 15, 1986, the day before the body was discovered.

The officers testified that, as of September 4, 1986, they did not believe Hawthorn was a suspect, but they did believe she knew more about the murder than she had told them. The information that Hawthorn gave the police contained a number of inconsistencies. For example, Hawthorn told Officer Jones that the last time she saw Johnson, he left in his car. However, Johnson's car was at Hawthorn's residence the first time the police came by after the discovery of Johnson's death. In addition, evidence indicated that Hawthorn was driving Johnson's car, rather than her own, during the time that Johnson was missing. Officer Silverberg testified that he became concerned when other persons gave him information which Hawthorn withheld. Finally, all of Johnson's associates suggested that Hawthorn must have played a part in Johnson's death.

Despite this information, the officers testified that on September 4, 1986, they felt that the investigation had come to a dead end. Therefore, as a "last shot," they decided to ask Hawthorn to submit to a polygraph examination.

Officer Jones testified that on September 4, he called Hawthorn and invited her to come to the Skokie police station for another interview about the Johnson homicide. Hawthorn agreed to come to the station and arrived around noon. At this time, Jones told Hawthorn that he believed that she was being untruthful and asked her to take a polygraph examination. Jones had received authorization from the department to incur the expense of the polygraph test prior to her arrival. When Hawthorn agreed to take the polygraph examination, Jones called Reid and Associates in Chicago and made an appointment for 1:30 p.m. Jones and Silverberg drove Hawthorn to the polygraph appointment in an unmarked police car.

Upon arriving at Reid and Associates, Hawthorn and the officers waited in the lobby prior to the examination. The officers remained with Hawthorn during this time, and Hawthorn slept while she waited.

Jones testified that he had a conversation with the polygraph examiner or his assistant prior to the polygraph test, but did not tell him

what he wanted discovered or discussed. Silverberg testified that he gave the examiner a list of questions he wanted the examiner to ask Hawthorn. The questions included: whether Hawthorn killed Johnson, whether she shot him with a handgun, whether she knew who killed him, and whether she was involved in his killing.

Michael Masokas, who was employed by Reid and Associates as a polygraph examiner, testified that he met with Jones and Silverberg at 1:15 p.m. for approximately 20 to 25 minutes. At this time he obtained background information from which to develop polygraph questions and received a list of questions from the officers.

Masokas then went into the room where Hawthorn had been placed by one of the receptionists. Jones and Silverberg waited in the lobby. Upon entering the room, Masokas observed that Hawthorn had a release form in front of her. Masokas asked Hawthorn if she had time to read it and, upon receiving an affirmative response, asked her to sign it. He signed the form as a witness to her signing.

Masokas then proceeded to examine Hawthorn in three distinct stages: the pretest interview, the polygraph test itself, and the post-test interrogation. During the initial interview, Masokas obtained general background information including her medical and work history. He asked Hawthorn if she knew why she was in the office. She responded that her boyfriend had been killed and she was a suspect in the murder so they wanted her to take the polygraph test. Masokas also asked her if she was involved in causing Johnson's death, and Hawthorn said no. Masokas observed her behavior as he asked these questions.

After 45 minutes to an hour, Masokas took Hawthorn into another room with a polygraph instrument. Prior to the actual examination, they reviewed the questions which would be asked during the test. Masokas then attached her to the instrument and proceeded with the examination. Masokas asked 10 questions, four of which were relevant to the investigation. This procedure took 30 to 35 minutes. Masokas then returned Hawthorn to the initial interview room and left to review the polygraph results for 10 to 15 minutes. Masokas concluded that Hawthorn was not telling the truth.

Upon returning to the interview room, Masokas confronted Hawthorn with the fact that she was not telling the truth and began the post-test interrogation. At the beginning of the interrogation Masokas told Hawthorn that the door was unlocked and she was free to leave. Masokas used an interrogation procedure known as the "Reid Nine Steps of Interrogation." One of the primary goals of this procedure is to minimize the moral guilt and responsibility associated with a crime, thereby inducing a suspect to confess. This goal is accomplished, in part,

through the development of themes which explain why the suspect may have committed the offense, and, at the same time, provide justification for committing the offense.

Approximately an hour into the interrogation, Louis Senese, then the chief examiner of Reid and Associates, entered the room. Prior to his entry, he had been monitoring the interrogation via an intercom system. Since Masokas appeared to be at an impasse, Senese offered his assistance. Senese continued to interrogate Hawthorn until he induced an admission. At that point he left the room.

When Senese stepped out of the room, Hawthorn provided Masokas with a 10- to 15-minute detailed account of the occurrence. Among other things Hawthorn told Masokas that her two sons had beaten Johnson in her apartment, knocked him unconscious, tied him up and taken him out through a window. At this point, Officer Jones, who had been summoned by Senese from the lobby, entered the room. Masokas summarized for Jones what Hawthorn told him. When Masokas finished, either Masokas or Officer Jones asked Hawthorn if the story was true and she agreed. It was approximately 5:30 p.m. at the time Hawthorn made this admission, and she had been in the continuous company of either police officers or polygraph examiners for approximately 5½ hours. No *Miranda* warnings were given prior to this admission.

Following her admission to Jones, Silverberg administered *Miranda* warnings to Hawthorn in the lobby, while Jones made some phone calls. Then they drove to Hawthorn's apartment, where Jones advised both Hawthorn and her 16-year-old son, Frank Robinson, of their *Miranda* rights. Hawthorn told Frank to go ahead and tell them what happened. Frank made a statement and was arrested.

The officers took Frank to the police station. Hawthorn was not arrested, but she also went to the station via her own transportation. Frank was placed alone in a room, until Hawthorn arrived and joined him. Shortly before 9 p.m., Assistant State's Attorney Mermel arrived at the police station and was briefed by the detectives. After Frank and Hawthorn executed *Miranda* waiver forms, Mermel had a 20- to 25-minute conversation with them, and then took a court-reported statement. After the statement was transcribed, Frank and Hawthorn signed it in the presence of Detective Brezezicki.

Hawthorn was arrested three months later and indicted for murder, armed violence, concealment of a homicidal death, aggravated kidnapping, aggravated unlawful restraint, solicitation, conspiracy and obstruction of justice. Hawthorn moved to suppress the statements she made on the ground that they were obtained in violation of *Miranda* and her fifth amendment rights.

On March 28, 1990, the circuit court ordered that all statements given by Hawthorn would be suppressed. The circuit court found that Hawthorn had been subject to a custodial interrogation without the requisite *Miranda* warnings. Therefore, the circuit court held that the statements made during this interrogation were inadmissible because they were obtained in violation of the defendant's fifth and sixth amendment rights. In addition, the circuit court held that the defendant's subsequent statements must be suppressed pursuant to the fruit of the poisonous tree doctrine.

The State appeals from the order of suppression.

OPINION

■ Initially we note that both the State and the defendant have agreed that no sixth amendment violation occurred. The sixth amendment guarantee of counsel attaches only at the initiation of adversarial judicial proceedings. (See *Kirby v. Illinois* (1972), 406 U.S. 682, 688, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1881.) On September 4, 1986, the day of the interrogation, no adversarial proceedings had commenced. Therefore, no sixth amendment violation occurred when Hawthorn was questioned in the absence of counsel. The circuit court erred in holding that a sixth amendment violation had occurred.

Two issues remain before this court. First, we must determine whether the trial court's holding that the defendant was "in custody" and, therefore, entitled to *Miranda* warnings is against the manifest weight of the evidence. Second, assuming that a *Miranda* violation took place, we must determine whether the trial court erred in concluding that the defendant's subsequent statement made to the assistant State's Attorney should be suppressed pursuant to the fruit of the poisonous tree doctrine.

In *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the United States Supreme Court held that in order to safeguard the fifth amendment right to be free from self-incrimination, *Miranda* warnings must be given to any defendant subject to custodial interrogation. The *Miranda* court defined a "custodial interrogation" as questioning initiated by law enforcement officers after a person has been taken into custody or has otherwise been deprived of his freedom of action in any significant way. *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612.

The determination of whether an interrogation is custodial should focus on all of the circumstances surrounding the questioning, including: the location, length, mood and mode of the interrogation; the number of police officers present; any indicia of formal arrest or evidence of re-

straint; the intentions of the officers; the extent of the officers' knowledge; and the focus of the investigation. (*People v. Brown* (1990), 136 Ill. 2d 116, 124-25, 554 N.E.2d 216.) The trial court must examine and weigh these factors, along with the credibility of the witnesses. It must then make an objective determination as to what a reasonable person, innocent of any crime, would perceive if he or she were in the defendant's position. (*Brown*, 136 Ill. 2d at 125.) The burden of proving that a defendant was not in a custodial situation and had not been deprived of his freedom of action in any significant way is on the State. (*In re N.E.R.* (1987), 159 Ill. App. 3d 320, 512 N.E. 2d 132.) When reviewing the trial court's ruling on a motion to suppress, a court of review will not disturb the trial court's finding unless it is manifestly erroneous. *Brown*, 136 Ill. 2d at 125.

The circuit court below did in fact consider each of the following factors: (1) the place where Hawthorn was interrogated; (2) statements and nonverbal conduct which might have indicated that Hawthorn was not free to leave; and (3) the extent of the police officers' knowledge and the focus of their investigation. In applying these factors, the court made the following findings of fact.

At the time of the interrogation, Hawthorn was a primary suspect. The police officers knew that Hawthorn had lived with Johnson and that she had a reason to fear Johnson because he had abused her in the past. The officers had reasonable grounds to believe that Hawthorn had been provided with a pistol which was the same caliber as the gun used to kill Johnson. They knew that this gun had been provided so that she could protect herself against Johnson. Finally, the police knew that Hawthorn showed very little emotion when informed of Johnson's death.

The court also found that the police officers employed subterfuge in requesting that Hawthorn come to the station for an interview when their actual, but unexpressed, motive was to induce her to submit to a polygraph test. Furthermore, instead of allowing Hawthorn to drive herself to the exam in her own car, the police drove her to the offices of Reid and Associates in an unmarked police car.

With respect to the place of interrogation, the circuit court found that in Hawthorn's case, the place of interrogation was a room or office which was specifically designed and intended for interrogation. At no time was Hawthorn ever outside of the presence of police; she was taken directly from the police station to another place which was specifically designed for interrogation purposes.

The court found that the polygraph examiners were acting as agents of the police. The police gave Masokas, one of the examiners, a list of questions to ask during the examination, and he did in fact ask those

questions. Upon completion of the polygraph test, Masokas confronted Hawthorn with the fact that she had failed the test and, therefore, was not telling the truth. Masokas and later Senese commenced an interrogation using the most scientifically efficient method of interrogation permissible under our judicial system.

Finally, the court found that the interrogation took place at a time which had long surpassed the investigation stage and in fact was at the accusatorial stage. Considering all of the above factors together, the circuit court found that Hawthorn's freedom had been significantly impaired throughout the entire day of September 4, 1986.

■ Initially the State contends that the circuit court's finding that Hawthorn was a primary suspect is against the manifest weight of the evidence. The State correctly points out that both Officer Jones and Officer Silverberg testified that they did not believe that Hawthorn was a suspect prior to September 4, 1986, the day of the interrogation. We note, however, that the record also contains evidence that the police possessed information which could lead a reasonable police officer to view Hawthorn as a suspect. Contrary to the State's argument, the trial court did not ignore the testimony of the officers. Instead, the trial court stated that in light of the evidence of the officers' knowledge about Hawthorn as of September 4, it found the testimony of the officers to be incredible. It is the function of the trial court to determine the credibility of the witnesses and to resolve any conflict in their testimony. (*People v. Melock* (1992), 149 Ill. 2d 423, 432, 599 N.E.2d 941.) In light of all the evidence before the trial court, we cannot say that its conclusion that Hawthorn was a suspect on September 4 was against the manifest weight of the evidence.

■ Next, the State argues that the trial court erred in finding that the polygraph examiners were acting as agents of the police. We disagree. Our supreme court has previously recognized that polygraph examiners may become agents of the police during an interrogation. (See *People v. Turner* (1973), 56 Ill. 2d 201, 207, 306 N.E.2d 27.) Whether or not the polygraph examiners have become agents of the police in a particular case depends upon the unique facts of that case. The facts in this case indicate that the polygraph examiners went far beyond merely administering a polygraph test. Masokas confronted Hawthorn with the fact that she failed the examination and, therefore, was not telling the truth. He then commenced a highly structured and stressful interrogation aimed at inducing a confession. When it became apparent that Masokas would not obtain a confession, Senese intervened and completed the interrogation. Only after the examiners had induced a confession did the examiners return Hawthorn to the police officers. Based upon the

facts of this case, we hold that the trial court's conclusion that the examiners were acting as agents of the police is not against the manifest weight of the evidence.

The State next contends that the trial court's conclusion that Hawthorn was in custody on September 4 is erroneous because the trial court applied the wrong standard. The State maintains that the trial court determined that Hawthorn was in custody because the officers considered her a primary suspect and focused their investigation on her. Therefore, the State asserts that the trial court improperly focused on the subjective intent of the police officers instead of the objective perceptions of a reasonable, innocent person in Hawthorn's position.

It is well established that *Miranda* warnings are not triggered solely by the government's focusing on a particular suspect. (See *Minnesota v. Murphy* (1984), 465 U.S. 420, 431, 79 L. Ed. 2d 409, 422, 104 S. Ct. 1136, 1144.) However, the knowledge possessed by the police, as well as the focus of their investigation, are two of many factors that may be considered in determining whether a particular interrogation was custodial. (*Brown*, 136 Ill. 2d at 124-25.) The subjective intent of the police officers is relevant to the extent that it might color their outward behavior toward an individual who is the subject of an interrogation. *People v. Bury* (1990), 199 Ill. App. 3d 207, 213, 556 N.E.2d 899.

■■ The State is correct in asserting that these factors should not control a trial court's determination of whether an interrogation is custodial. (See *Brown*, 136 Ill. 2d at 129.) However, the State is mistaken in asserting that the subjective intentions of the police officers did control the outcome of the trial court's decision in this instance. After discussing the officers' conduct toward Hawthorn, the court stated "the actions of the Skokie Police *** would indicate that a reasonable person would be at least apprehensive as to whether or not they were free to go." Moreover, after carefully considering all the circumstances surrounding the questioning, the trial court stated, "[t]aking all those factors together, *the Court is satisfied that throughout the entire day of September 4 that Carolyn Hawthorn's freedom had been significantly impaired* and that she was a suspect and that she would be interrogated at an accusatorial stage and not an investigation stage." (Emphasis added.) Although we do not agree with the trial court's finding that Hawthorn's freedom was significantly impaired throughout the *entire* day of September 4, we are satisfied that the circuit court considered all of the factors surrounding the questioning of Hawthorn. The trial court did not focus exclusively on the subjective intent of the officers but, instead, applied the proper standard in determining whether the interrogation of Hawthorn was custodial. We hold that the trial court's conclu-

sion that the interrogation of Hawthorn by the police was custodial is not against the weight of the evidence insofar as it applies to the questioning by the police after they were informed of her admission.

The State next contends that the Illinois Supreme Court case of *Melock* (149 Ill. 2d 423, 599 N.E.2d 941) dictates that we reverse the trial court's suppression order. We disagree. In *Melock*, the defendant was suspected of murdering his grandmother. The police went to Melock's home and requested that he accompany them to the police station. Melock was taken to an interview room and questioned for two hours. While Melock was at the station, he offered to take a polygraph examination to prove that he was telling the truth. Melock was transported from the police department to the offices of John Reid and Associates by the interrogating officers. Upon arriving, Melock sat alone in an unsecured waiting room for about 30 minutes while the police officers spoke with the polygraph examiners.

Like the case at bar, Masokas, the polygraph examiner, questioned Melock in three distinct stages: the pretest interview, the polygraph test itself, and the post-test interrogation. As in Hawthorn's case, the polygraph examiner induced an admission during the post-test interrogation and then summoned the police officers. However, before eliciting any statement from Melock, the police read Melock his *Miranda* rights. The trial court held that Melock was not in custody prior to the point in time that Melock made the admission to Masokas and the supreme court affirmed. *Melock*, 149 Ill. 2d at 436, 443.

We disagree with the State's contention that *Melock* controls the outcome of this case. The facts of the instant case differ from those of *Melock* in one critical respect. In *Melock*, the defendant was given *Miranda* warnings as soon as he made an admission to the polygraph examiners and *before* he made any statement to the police officers. In contrast, Hawthorn was not given *Miranda* warnings as soon as the polygraph examiners induced an admission from her. Instead, the police elicited a second admission from Hawthorn before they gave her *Miranda* warnings. In light of the facts of this case, it is our view that *Miranda* warnings should have been given after the polygraph examiners induced an admission and before the police elicited any further statements.

The facts before the court present an extremely close case. We are mindful of the limited scope of our review; the trial court's determination will not be reversed unless it is manifestly erroneous. (*Melock*, 149 Ill. 2d at 432.) In light of all the circumstances surrounding the questioning of Hawthorn, we cannot say that the circuit court's conclusion that Hawthorn was in custody and, therefore, entitled to *Miranda* warnings

at the point she made her initial admission to the police officers following the polygraph examination is against the manifest weight of the evidence. Therefore, the trial court did not err in suppressing Hawthorn's initial statement.

We now turn to Hawthorn's subsequent statement which was made to Assistant State's Attorney Mermel at the police station later that evening. The trial court found this statement to be the "fruit" of the initial custodial interrogation conducted in violation of *Miranda*. The trial court further found that no attenuation occurred between the initial violation and the subsequent statement. Therefore, the trial court held that these statements were inadmissible pursuant to the fruit of the poisonous tree doctrine. We disagree.

■ In *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285, the United States Supreme Court held that the fruit of the poisonous tree doctrine is not applicable to *Miranda* violations. The fruit of the poisonous tree doctrine originated in *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407, in which the Supreme Court held that evidence and witnesses discovered as a result of a search conducted in violation of the fourth amendment must be excluded. The principle of *Wong Sun* also applies when the fruit of the fourth amendment violation is a confession. (*Elstad*, 470 U.S. at 305-06, 84 L. Ed. 2d at 230, 105 S. Ct. at 1291.) It is well settled that when a confession is obtained in violation of the fourth amendment, the confession must be excluded " 'unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is "sufficiently an act of free will to purge the primary taint." ' " *Elstad*, 470 U.S. at 306, 84 L. Ed. 2d at 230, 105 S. Ct. at 1291, quoting *Taylor v. Alabama* (1982), 457 U.S. 687, 690, 73 L. Ed. 2d 314, 319, 102 S. Ct. 2664, 2667.

As the *Miranda* Court observed, however, *Miranda* violations differ significantly from fourth amendment violations, which have traditionally warranted a broad application of the "fruits" doctrine. The fourth amendment exclusionary rule is designed to deter unreasonable searches, no matter how probative their fruits. In contrast, the *Miranda* exclusionary rule was created to safeguard fifth amendment rights and sweeps more broadly than the fifth amendment itself. (*Elstad*, 470 U.S. at 306, 84 L. Ed. 2d at 230, 105 S. Ct. 1291-92.) *Miranda* warnings are not themselves rights protected by the Constitution. Instead, the requirement that *Miranda* warnings be given is a prophylactic measure designed to insure that the right against compulsory self-incrimination is protected. (See *Michigan v. Tucker* (1974), 417 U.S. 433, 444, 41 L. Ed. 2d 182, 193, 94 S. Ct. 2357, 2364.) As such, the *Miranda* exclusionary

rule may be triggered even in the absence of a fifth amendment violation. (*Elstad*, 470 U.S. at 306, 84 L. Ed. 2d at 230, 105 S. Ct. at 1292.) In light of these considerations, the Supreme Court in *Elstad* concluded:

> "It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Elstad*, 470 U.S. at 309, 84 L. Ed. 2d at 232, 105 S. Ct. at 1293.

The principle set forth in *Elstad* is clear. The failure to administer *Miranda* in the absence of coercion does not implicate the fruit of the poisonous tree doctrine. In the case at bar, the trial court did not make a finding of coercion. The defendant urges this court to impute a finding of coercion to the trial court. Defendant asserts that since the trial court failed to apply *Elstad*, it "apparently recognized" that more than a mere failure to administer *Miranda* warnings occurred. We disagree. The trial court suppressed the initial statements solely because Hawthorn was not given *Miranda* rights:

> "[Hawthorn] did have the right to be advised under doctrines of the Fifth and Sixth Amendment that any statement that she may make could and would be used against her and that she had the right to have the presence of an attorney with her before any questioning, that the absences of those warnings that any statement made by her must therefore and reluctantly must be excluded from evidence to be used against her."

Furthermore, there is no basis in the record to support a finding of coercion. The facts of this case indicate that the only violation of Hawthorn's rights that occurred was the failure to administer *Miranda* warnings. Therefore, the trial court erred in applying the fruit of the poisonous tree doctrine.

As discussed in *Elstad*, the only relevant issue concerning Hawthorn's subsequent statement is whether it was made voluntarily. A statement is voluntary where under the totality of the circumstances, it is given freely, voluntarily and without compulsion or inducement. On the other hand, a statement is involuntary if the defendant's will was overcome at the time he confessed. (*People v. House* (1990), 141 Ill. 2d 323, 376, 566 N.E.2d 259.) Factors the court should consider when making a determination of voluntariness include the age, education and in-

telligence of the accused; the duration of the questioning; whether the accused was apprised of his constitutional rights; and whether the accused was subjected to any physical punishment, such as the deprivation of food or water. (See *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 226, 36 L. Ed. 2d 854, 862, 93 S. Ct. 2041, 2047; *People v. Martin* (1984), 102 Ill. 2d 412, 427, 466 N.E.2d 228.) No single fact is dispositive; the question must be answered on the facts of each case. *Melock*, 149 Ill. 2d at 447-48.

■■ The facts of this case indicate that after Hawthorn made an initial admission at the polygraph office, she was given *Miranda* warnings. The police then drove her home. Upon arriving at Hawthorn's home, the officers gave *Miranda* warnings to both Hawthorn and her son, Frank. At this time Frank admitted his involvement in the murder and gave a statement to the police. The officers then placed Frank under arrest and took him to the police station. Hawthorn was not arrested, but instead was left at home, alone. Hawthorn then went to the station of her own volition in order to be with her son. At the station, Assistant State's Attorney Mermel gave *Miranda* warnings to both Hawthorn and her son before taking a joint statement. Both Hawthorn and Frank waived their *Miranda* rights and gave a statement. Considering the totality of the circumstances surrounding Hawthorn's subsequent statement, we hold that the statement was voluntary and, therefore, admissible. The trial court erred in suppressing the statement.

For the foregoing reasons, the decision of the trial court is affirmed in part and reversed in part and remanded.

Affirmed in part and reversed in part and remanded.

GORDON, P.J., and MURRAY, J., concur.