2024 IL App (1st) 220383-U

No. 1-22-0383

December 24, 2024

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 60079 |
| | ) | |
| IOAN LELA, | ) | Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Ellis concurred in the judgment.

ORDER

¶ 1　　*Held*:　We affirm the judgment of the trial court when defendant's contentions in this *pro se* appeal are not cohesive legal arguments supported by pertinent legal authority and fail to meet the requirements of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). To the extent defendant's arguments are discernable, he has failed to establish error.

¶ 2　　Following a bench trial where he represented himself, defendant Ioan Lela was found guilty

of first degree murder, home invasion, residential burglary, and robbery. The court merged the

counts and imposed a 30-year prison sentence for first degree murder. Defendant now appeals *pro*

*se*, alleging that the trial court erred in denying his motion to suppress his statement based upon violations of his right to counsel under the fifth and sixth amendments and by admitting the "involuntary" statement as "substantive" evidence at trial. Defendant further contends that the court erred when it denied his motions for a "directed verdict" and to dismiss/reverse the conviction due to "misconduct" by the State and police. We affirm.

¶ 3     Defendant was charged by indictment with first degree murder, home invasion, residential burglary, and robbery, following the January 24, 2016, death of the victim, Allen Levin, in Chicago. The indictment also charged Michael Bembea and Elijah Timatyos.[1]

¶ 4     On February 21, 2017, defendant filed, through private counsel, a motion to suppress his statement. The motion alleged that, although officers informed defendant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), during a custodial interview, they failed to disclose the existence of a warrant for defendant's arrest and continued the interrogation after defendant invoked his right to counsel.[2]

¶ 5     On May 31, 2017, the trial court held a hearing on the motion. In opening argument, private counsel asserted that the police "played unreasonably" on defendant's ignorance, and that interrogation continued despite defendant stating that he "need[ed] a lawyer." The State responded that defendant's statement was equivocal and ambiguous.

¶ 6     Chicago police detective Mark Leavitt testified that on February 18, 2016, he traveled to Phoenix, Arizona to speak to defendant. At this time, Leavitt possessed a warrant to arrest

---

[1] For clarity, we will refer to members of the Bembea family by their first names.
[2] The second page of the motion contained in the record on appeal is illegible.

defendant for first degree murder. Defendant came to a police station after the Phoenix Police Department arranged for him to retrieve a cell phone previously taken pursuant to a search warrant.

¶ 7    In the interview room, Leavitt introduced himself and orally advised defendant of the *Miranda* rights. Leavitt did not stop after each right to ask if defendant understood and did not tell defendant about the arrest warrant until "later on in the day."

¶ 8    The interview was recorded. Leavitt identified a videodisk which accurately depicted the interview. The State asked to admit the disk into evidence, which the trial court allowed.[3] After the State published several portions of the interview, the trial court asked whether a transcript was prepared because it was difficult to understand the interview. Private counsel offered to provide the court with a transcript.

¶ 9    Leavitt then testified that around 20 minutes into the interview, defendant asked for water. Private counsel then asked whether defendant stated, "I don't know if I need a lawyer to figure this case out because I don't know where it's going or what's going on with this case any more honestly." Leavitt answered, "Okay" and "Sounds about accurate." Leavitt did not stop the interview to ask defendant if he wanted a lawyer and defendant continued to speak. Leavitt did not ask if defendant wanted a lawyer because that was not Leavitt's "job"; rather, he continued to question defendant. When private counsel asked Leavitt whether Leavitt told defendant the interview was to "clear up something" because Timatyos said "one thing" and Michael "another," Leavitt agreed that was "part of the conversation."

---

[3] This disk is contained in the record on appeal. The disk contains a 4 hour and 58 minute video. However, there is no audio.

¶ 10 During cross-examination, Leavitt testified that defendant did not state that he did not wish to speak to Leavitt. After defendant stated that he did not know whether he needed an attorney, he continued to speak to Leavitt and did not assert that he no longer wanted speak to Leavitt.

¶ 11 In the February 18, 2016, statement, defendant stated he attended high school and owned a business. Defendant further stated that Michael planned to ask Levin to borrow money from Levin, but then robbed "his friend." Defendant stated that he heard Levin's last words, " 'Mikey, why would you do that?' " At this point, Michael came outside and told defendant and Timatyos to come inside. Once inside, defendant saw a man on the floor as well as blood and brains. Defendant stated that Michael admitted that he threw Levin down the stairs and stomped on Levin's head. Leavitt then told defendant that Michael stated that it was defendant who wanted to go to Levin's home, which defendant denied. Defendant stated that Michael forced defendant and Timatyos to accompany him and threatened to kill them if they left.

¶ 12 Defendant then stated that "I don't know if I need a lawyer to figure out this case cause where it's going or what's going on with this case anymore, honestly." Leavitt then stated that they were there to "clear up" things because Michael and Timatyos gave different accounts of events. Defendant denied seeing "any of the violence." He asserted that Michael forced defendant and Timatyos to hold bags, which Michael then filled with "stuff."

¶ 13 Levitt asked defendant about his text messages to Michael's sister, Charlene Bembea. Defendant acknowledged texting Charlene about his financial situation and that Michael told him to text Charlene to get help from Levin. He asserted that certain texts on his phone were sent by Michael.

¶ 14    Defendant stated that Michael planned to go to Chicago alone, but defendant accompanied Michael to prevent "stupid s***." Defendant next stated that he did not want to go, but Michael insisted. At Levin's home, Michael yelled and banged on the front door. Defendant did not know how Michael gained entry to the house, but at one point, Michael and Levin came to a side door and Michael introduced defendant and Timatyos. Levin told them to go to the front door. As defendant walked, he heard "tumbling," and assumed that Michael threw Levin down the stairs.

¶ 15    Leavitt asked defendant about a footprint on Levin's back. Defendant stated that he saw Michael step on Levin's back. Defendant then stated that he did not know what Michael did because he was outside. Leavitt told defendant that Michael stated that defendant choked Levin. Defendant then stated that when he entered the house, Levin was "gargling." Michael told defendant to "do it" or Michael would kill defendant. Defendant then held Levin as Michael "stomped" on him and blood "just shot out." He did not remember how he held Levin and denied kicking Levin in the head. When Leavitt then asked whether defendant covered Levin's mouth, defendant stated, "[j]ust like *** barely." Defendant stated that $700 in coins was taken from Levin's house, but denied taking any rare coins. He also stated that Michael took items from "Grams [*sic*]" house, where they stayed.

¶ 16    Leavitt then stated that Levin paid some of Michael's bills and that Levin confided in Charlene that he planned to "cut" Michael off. Defendant stated he was "shocked." Leavitt then stated that Michael admitted to throwing Levin down the stairs and stomping on Levin's back. Leavitt asked defendant why Michael would admit to those actions and then lie about defendant choking Levin and kicking him in the head. Defendant denied kicking Levin in the head. He later agreed with Leavitt that it was "possible" that his hand "slipped" to Levin's neck.

¶ 17    The court continued the cause so that the parties could provide a transcript of defendant's statement. On June 19, 2017, private counsel tendered a transcript of defendant's statement to the court and the State.

¶ 18    On July 25, 2017, the trial court heard argument on the motion. The State argued that based upon the written motion the matter before the court was "strictly" a *Miranda* issue, and that defendant's ambiguous statement that he "maybe" should see an attorney was not sufficient to require the police to stop questioning.

¶ 19    Private counsel responded that the issues of *Miranda* and voluntariness went "hand in hand," because defendant was not informed about the warrant prior to questioning and because a "ruse" was used to bring him to a police station. Moreover, counsel asserted that defendant invoked his right to counsel by stating that he did not know if he needed an attorney to figure out this case. In context, according to counsel, defendant stated that he needed a lawyer. Counsel asserted that Leavitt acknowledged this request when Leavitt stated that defendant was "just here to clear some things up." The State then argued that a suspect did not have the right to be informed of specific charges and there was no requirement that officers be "brutally honest."

¶ 20    In denying the motion, the court found that defendant understood the *Miranda* rights, and knowingly and voluntarily chose to waive them. The court further found that defendant's statement that he did not know if he needed a lawyer to figure out this case was ambiguous and equivocal.

¶ 21    Private counsel thereafter moved to withdraw, which the court allowed. Defendant later informed the court that he wished to proceed *pro se*, which the court allowed.

¶ 22    On March 1, 2019, defendant filed a *pro se* motion to reconsider the denial of the motion to suppress statement alleging, *inter alia*, that once defendant was informed of the *Miranda* rights,

his sixth amendment right to counsel during custodial interrogation was "triggered." The motion further alleged that officers engaged in "official misconduct" because the goal of the interview was that defendant incriminate himself.

¶ 23 On April 5, 2019, the trial court denied the motion to reconsider, reiterating that defendant was admonished as to the *Miranda* rights, which he then waived, and agreed to speak with detectives. Moreover, the "mere mention of possibly needing a lawyer" did not mandate that officers terminate questioning.

¶ 24 On May 3, 2019, defendant filed a *pro se* motion to suppress statement alleging, relevant here, that he was never informed that he was under arrest pursuant to a warrant and that he had the right to an attorney "after the first formal charging proceeding."

¶ 25 When the court asked defendant what was "new" in the motion, defendant stated that this motion "strictly" alleged a sixth amendment violation. The court then asked whether defendant's motion argued that because a warrant was issued for his arrest, his sixth amendment right to counsel applied, and defendant answered in the affirmative. The court disagreed, finding that the fact that a warrant was issued did not mean that defendant was indicted.

¶ 26 On May 30, 2019, defendant filed a *pro se* amended motion to suppress statement alleging that prior to the interrogation, he was not informed of the arrest warrant or his sixth amendment right to counsel. The motion alleged that the right to counsel attached because defendant had been "formally charged by information" with first degree murder.

¶ 27 On June 20, 2019, the court heard argument on the amended motion. Defendant argued that the right to counsel attached when the "government" committed itself to prosecution and asserted that he was charged with first degree murder on February 16, 2016, when an arrest warrant

issued. The State responded that defendant was arrested on February 18, 2016, and indicted on March 25, 2016. The court denied the amended motion, noting that it was not until "formal charges" were filed that the rights defendant alluded to were triggered.

¶ 28    At trial, Charlene testified that Levin was a family friend and she knew defendant from church and as a student of her late father. After Charlene's father died, defendant took Michael to Arizona. Michael was addicted to narcotics and she did not trust him with money. Between December 2015 and January 2016, Michael asked Charlene for money, to contact Levin about money, and for Levin's number. Defendant also texted, sharing his financial troubles and asking if she talked to Levin.

¶ 29    Charlene communicated with Levin on January 24, 2016. On January 27, 2016, he did not respond. After a Snapchat conversation with Michael's girlfriend, Charlene went to Levin's home and noticed a pile of mail. She called the police and Levin was discovered deceased. Charlene did not see defendant or Michael in Chicago between January 22, 2016, and January 27, 2016.

¶ 30    An assistant medical examiner testified that Levin's autopsy revealed, relevant here, injuries consistent with someone stomping on his back and strangulation. She concluded that Levin's cause of death was multiple injuries due to assault and the manner of death was homicide.

¶ 31    Defendant then filed a "motion in *limine*" to suppress statements and evidence due to violations of the right to counsel under the fifth, sixth, and fourteenth amendments. Attached were, relevant here, two Phoenix Police Department incident reports. The first one, dated February 3, 2016, detailed an interview with defendant and that questioning terminated when defendant asked for an attorney. The report further stated that the interview was recorded, that defendant's cell phone was taken pursuant to a search warrant, and that defendant was released. The second report,

also dated February 3, 2016, stated, in pertinent part, that on February 18, 2016, defendant came to a police station under the "ruse" that he could retrieve his phone and that there was a felony arrest warrant for defendant from Chicago.

¶ 32    The trial court denied the motion. Defendant filed a motion to reconsider alleging that the motion was based on defendant's unambiguous invocation of his right to counsel on February 3, 2016, which the court denied.

¶ 33    When trial resumed, Leavitt testified that after speaking to Charlene, he spoke to Michael's former girlfriend who, in turn, took officers to the home of Graham Witherbee. After speaking to Witherbee, Leavitt searched for Michael and defendant and determined that they were in Phoenix. Leavitt contacted the Phoenix Police Department, and officers there determined defendant's address and executed a search warrant. Leavitt then obtained arrest warrants for Michael, Timatyos, and defendant, and went to Phoenix. The local police arranged for defendant to come to a police station where Leavitt and another detective spoke to him. This interview was recorded.

¶ 34    At trial, Leavitt identified a videodisk which he asserted was a fair and accurate depiction of the February 18, 2016, interview.[4] The State published the video over defendant's objections. The court stated that it would review the video at a later time and instructed the parties to create an "agreeable transcript."

¶ 35    During cross-examination, Leavitt acknowledged that he was "made aware" by the Phoenix Police Department that defendant spoke to Detective Erin Murphy on February 3, 2016, and that the interview stopped when defendant invoked his right to an attorney.

---

[4] The disk is contained in the record on appeal. As noted, the footage contains video and no audio.

¶ 36    Witherbee, who knew Michael through church, testified that around 4 a.m. on January 23, 2016, Michael knocked on the bedroom window of his residence in Chicago. Witherbee let Michael and defendant inside. Michael stated that he was in town "hitting licks," which Witherbee understood to mean burglarizing houses. Defendant later drove Witherbee to a drugstore, using a different route than the one Witherbee suggested. Defendant explained that he had family in the area and did not want to be seen. Later, when Witherbee had friends over, defendant and Michael left because Michael stated that they did not want to be seen. They returned to Witherbee's home when the guests left.

¶ 37    Defendant and Michael left, then returned the morning of Sunday, January 24, 2016, asking to sleep in preparation for the trip back to Arizona. Later that day, Witherbee overheard Michael say something about his "dad's best friend." When Witherbee entered the room, defendant and Michael continued their conversation in another language. After Michael and defendant left, Witherbee discovered a pair of shoes and three belts missing. During cross-examination, Witherbee acknowledged that Michael also took narcotics.

¶ 38    Murphy, a retired Phoenix police detective, testified that on February 3, 2016, she spoke to defendant at a police station. During the interview, defendant invoked his right to counsel and questioning stopped. Although defendant was released from custody, his cell phone was retained. At some point, Murphy's report summarizing the interview was sent to Chicago detectives. The February 3, 2016, interview was videotaped, and the State published the interview to the court over defendant's objection.

¶ 39    The videodisk is included in the record on appeal and this court has reviewed it. In this interview, defendant denied being in Chicago in January 2016.

¶ 40    The parties then tendered the court a 92-page transcript of defendant's February 18, 2016, interview with Detective Leavitt.

¶ 41    At the close of the State's case, defendant moved for a "directed verdict," arguing, relevant here, that his inculpatory statement resulted from Leavitt's misconduct and that defendant previously invoked his right to counsel during a custodial interrogation. The court denied the motion.

¶ 42    The parties then stipulated that, if called by defendant, Detective Paul Dalton of the "Arizona Police Department" would testify that the "first" search warrant he obtained was "for the house where [Dalton] took [defendant] from." Additionally, if Dalton was asked whether he recovered "any items that were identified as having been in the house that was the subject of the incident in Chicago," he would answer that he did not believe so.

¶ 43    Following argument, the trial court found defendant guilty of robbery, residential burglary, home invasion, and first degree murder. The court noted that defendant gave two distinct statements. Defendant first told Murphy that he was not in Chicago in January 2016, which was contradicted by Witherbee's testimony. Then, defendant told Leavitt that he was in Levin's home on the date of Levin's death and placed his hand over Levin's face.

¶ 44    Defendant then filed a motion and amended motion for a new trial and/or judgment for acquittal alleging, relevant here, that the court's guilty findings were based on defendant's improperly admitted statement, which was obtained through police and prosecutorial misconduct. The motion further alleged that the trial court erred when it refused to suppress the statement. Defendant also filed a motion to dismiss/reverse convictions which also challenged the admission

of his statement and alleged that although Leavitt knew that defendant previously invoked his right to counsel, Leavitt "schemed" to obtain defendant's statement.[5]

¶ 45    On October 18, 2021, the trial court denied defendant's motions. The court merged the counts and imposed a 30-year sentence for first degree murder. Defendant filed a motion to reconsider the denial of his posttrial motions, which the court denied. He now appeals *pro se*.

¶ 46    Initially, our review of defendant's appeal is hindered by his failure to comply with Illinois Supreme Court Rule 341(h) (eff. Oct. 1, 2020), which sets forth the required format and contents of appellate briefs. While defendant's briefs contain his argument and characterization of the facts of the case, they do not contain clearly defined issues, citations to pertinent authority, and cohesive legal arguments. See *People v. Hood*, 210 Ill. App. 3d 743, 746 (1991) ("A reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository into which the appealing party may dump the burden of argument and research."). "Arguments that do not comply with Rule 341(h)(7) do not merit consideration on appeal and may be rejected by this court for that reason alone." *Wells Fargo Bank, N.A. v. Sanders*, 2015 IL App (1st) 141272, ¶ 43. Accordingly, to the extent that defendant's briefs fail to comply with Rule 341(h)(7), his arguments are forfeited.

¶ 47    Supreme court rules are not suggestions, and we may strike a brief for failure to comply with the rules. *People v. Williams*, 2020 IL App (3d) 180024, ¶ 25. However, because the merits of this case can be ascertained from the record, and we have the benefit of a cogent appellee's

_____

[5] The common law record indicates that a supplement to this motion was filed. It is not included in the record on appeal.

brief, we choose to consider the discernible merits of this appeal. See *Twardowski v. Holiday Hospitality Franchising, Inc*., 321 Ill. App. 3d 509, 511 (2001).

¶ 48    Defendant first contends that the trial court erred in denying his motion to suppress statement based upon his right to counsel under the fifth and sixth amendments when he invoked his right to counsel during a "prior" interrogation.

¶ 49    Initially, we note that defendant filed numerous motions in the trial court seeking to suppress his February 18, 2016, statement. His briefs do not identify which denial he challenges; rather, on appeal, he makes general arguments about the statement's alleged inadmissibility. Moreover, although defendant cites and explains several Supreme Court cases in support of his arguments, he has failed to present well-reasoned legal arguments tying the cited authority to the facts of this case. As noted, a reviewing court is not a depository into which the appellant, in this case defendant, may unload his burden of argument and research. *People v. Macias*, 2015 IL App (1st) 132039, ¶ 88.

¶ 50    Construing defendant's arguments broadly, his position on appeal appears to be that his February 18, 2016, statement should have been suppressed because (1) he invoked his right to counsel during a custodial interview on February 3, 2016, and (2) he was entitled to counsel under the sixth amendment because the purpose of the February 18, 2016, interview was to elicit an incriminating statement. We disagree.

¶ 51    Once a person invokes the right to counsel, officers cannot interrogate him or her further unless the accused initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). As our supreme court explained, this rule seeks

to prevent officers from badgering a person into the waiver of his or her previous assertion of the right to counsel. *People v. Woolley*, 178 Ill. 2d 175, 198 (1997).

¶ 52    In *Maryland v. Shatzer*, 559 U.S. 98 (2010), the Supreme Court addressed the effect of breaks in custodial interrogation. The Court acknowledged that once a defendant invokes his right to counsel under *Miranda*, subsequent requests for interrogation pose a significantly greater risk of coercion. *Id.* at 105. The court further acknowledged that the *Edwards* rule was not a "constitutional mandate," but rather a "judicially prescribed prophylaxis." *Id.* The Supreme Court then held that police may reinitiate questioning with a defendant who invokes his right to counsel after a 14-day "break in custody" as 14 days would provide "plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." *Id.* at 110-11.

¶ 53    Here, the record reveals that on February 3, 2016, when defendant invoked his right to counsel during an interview with Murphy, she ended the interview. Defendant was then released from custody. On February 18, 2016, defendant came to the police station to retrieve a cell phone, met with Leavitt, waived his *Miranda* rights, and made an inculpatory statement. Defendant was out of custody for 14 days. It was the next day, or 15 days later, that he spoke to Leavitt. Thus, in compliance with *Shatzer*, there was a 14-day break between interviews.

¶ 54    Moreover, the sixth amendment right to counsel does not attach until the commencement of a prosecution, *i.e.*, "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." (Internal quotation marks omitted.) *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). "[A]bsent significant prosecutorial involvement, neither the filing of a complaint for an arrest warrant nor the issuance

of an arrest warrant constitutes the commencement of adversarial judicial proceedings triggering a defendant's sixth amendment right to counsel." *People v. Rudd*, 2020 IL App (1st) 182037, ¶ 69. Moreover, in Illinois, a felony prosecution can only be commenced through an indictment or information. *Id.* ¶ 70; see also 725 ILCS 5/111-2(a) (West 2016).

¶ 55    Here, the record reveals that defendant was indicted on March 25, 2016, and that the indictment was filed in the circuit court on March 31, 2016. Because the felony prosecution of defendant had not yet begun at the time of the February 18, 2016, interview, his sixth amendment right to counsel had not yet attached. Rather, defendant's sixth amendment right to counsel attached when he was indicted on March 25, 2016.

¶ 56    Defendant next contends that the trial court erred when it admitted his "involuntary" statement against him at trial in violation of the fourteenth amendment's due process clause. Defendant asserts that his statement was involuntary because he went to the police station pursuant to a "ruse" to retrieve his cell phone, and because Leavitt assured defendant that he only needed to "clear up a few things" and failed to disclose the arrest warrant.

¶ 57    A statement is voluntary where, considering the totality of the circumstances, it is given freely, voluntarily, and without compulsion or inducement. See *People v. Hawthorn*, 244 Ill. App. 3d 687, 698 (1993). A statement is involuntary, however, if the defendant's "will was overcome" at the time of the statement. *Id.* Factors that the court should consider when determining whether a statement was voluntary include the defendant's age, education, and intelligence, the duration of the questioning, whether the defendant was apprised of his constitutional rights, and whether the defendant was subjected to physical punishment such as the deprivation of food or water. *Id.* at 698-99. No one factor is dispositive and the determination is fact specific. *Id.* at 699.

¶ 58    Here, the record reflects that defendant came to the police station voluntarily, and during the interview was apprised of the *Miranda* rights and given water. During the interview, defendant stated that he attended high school and was business owner. While the interview was several hours long, considering the totality of the circumstances, the statement was voluntary. See *id.* at 698-99.

¶ 59    Moreover, defendant fails to explain how the facts that he identifies rendered his statement involuntary. *Hood*, 210 Ill. App. 3d at 746 ("mere contentions, without argument or citation of authority, do not merit consideration on appeal"). This conclusory argument is unsupported by authority or well-reasoned legal arguments, and results in its forfeiture on appeal. *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 205; see also *People v. Nere*, 2018 IL 122566, ¶ 25 (a reviewing court confines its analysis to issues that are sufficiently developed for its consideration).

¶ 60    Defendant next contends that the trial court erred when it denied his motion for a "directed verdict" because there was insufficient evidence that Michael told defendant of his "criminal plans," or that defendant knew of Michael's intent to commit an offense. In the alternative, he argues that no "forensic evidence" established that his actions caused Levin's death.

¶ 61    Initially, we note that this was a bench trial, and defendant's motion is more properly classified as a motion for a directed finding of not guilty. Pursuant to the Code of Criminal Procedure of 1963, when "at the close of the State's evidence ***, the evidence is insufficient to support a finding or verdict of guilty the court may and on motion of the defendant shall make a finding *** of not guilty, enter a judgment of acquittal and discharge the defendant." 725 ILCS 5/115-4(k) (West 2016).

¶ 62    When ruling on a motion for a directed finding, the trial court determines only whether a reasonable mind could fairly conclude the guilt of the accused beyond a reasonable doubt, while

considering the evidence most strongly in the State's favor. *People v. Cazacu*, 373 Ill. App. 3d 465, 473 (2007). When moving for a directed finding, a defendant admits the truth of the State's evidence for purposes of the motion. *People v. Aljohani*, 2021 IL App (1st) 190692, ¶ 78, *aff'd*, 2022 IL 127037. However, if a defendant chooses to present evidence following the denial of a motion for a directed finding at the close of the State's case, he "waives any error resulting from the trial court's ruling on the motion unless he renews his motion at the close of all evidence." *Cazacu*, 373 Ill. App. 3d at 473. A motion for a directed finding of not guilty presents a question of law, which we review *de novo*. *Aljohani*, 2021 IL App (1st) 190692, ¶ 78.

¶ 63     In the case at bar, following the trial court's denial of defendant's motion for a "directed verdict," defendant presented a stipulation during his case-in-chief and did not renew his motion at the close of all evidence. Accordingly, defendant has waived any error resulting from the trial court's ruling. *People v. Wilson*, 143 Ill. 2d 236, 245 (1991) ("Where a defendant elected to present evidence following the denial of his motion for a directed finding, any error in the trial court's ruling on the motion is waived unless the defendant renews the motion at the close of all the evidence."). Even had defendant preserved this issue for review, however, his argument would still fail.

¶ 64     At trial, the evidence included defendant's inculpatory statement that he "barely" held his hand over Levin's mouth while Michael stomped on Levin's back, and testimony from an assistant medical examiner that Levin's autopsy revealed injuries consistent with someone stomping on his back. Moreover, defendant cites no authority for the proposition that the lack of forensic evidence was fatal to the State's case or warranted the grant of a motion for a directed finding. See *Hood*, 210 Ill. App. 3d at 746 ("mere contentions, without argument or citation of authority, do not merit

consideration on appeal"). To the contrary, forensic evidence is not required to sustain a conviction. See *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 55 (noting that "it is well settled in Illinois that a conviction can be sustained solely on circumstantial evidence"). Considering the evidence most strongly in the State's favor, a reasonable mind could fairly conclude defendant's guilt beyond a reasonable doubt and the trial court properly denied defendant's motion. *Cazacu*, 373 Ill. App. 3d at 473.

¶ 65    Finally, defendant contends that the trial court "grossly erred" in denying his motion to dismiss/reverse the convictions when his inculpatory statement was the result of a "plan of deceit and trickery" by members of the Chicago Police Department and the State's Attorney's Office "despite full knowledge" that defendant previously invoked his fifth amendment right to counsel. He further asserts the Civilian Office of Police Accountability has documented 52 complaints against Detective Leavitt.

¶ 66    In this argument, as with his others, defendant cites caselaw, but does not include well-reasoned legal arguments or explain how the cited authority applies to the facts of this case in violation of Rule 341(h)(7). See *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010) ("An issue that is merely listed or included in a vague allegation of error is not 'argued' and will not satisfy the requirements of the rule."). Additionally, as discussed, when defendant invoked his right to counsel at the February 3, 2016, interview, that interview ended and he was released from custody. The next interview, on February 18, 2016, was more than 14 days later, and therefore complied with the requirements of *Edwards* and *Shatzer*.

¶ 67    Moreover, although defendant relies on a report from the Civilian Office of Police Accountability as evidence of Leavitt's alleged misconduct, this document is not included in the

record on appeal and we therefore cannot considered it. See *People v. Mehlberg*, 249 Ill. App. 3d 499, 532 (1993) ("A reviewing court must determine the issues before it on appeal solely on the basis of the record made in the trial court."); see also *Jackson v. South Holland Dodge, Inc*., 197 Ill. 2d 39, 55 (2001) (documents not submitted to the circuit court are not properly a part of the record on appeal and therefore cannot be considered).

¶ 68    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 69    Affirmed.